**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Thomas E. MACEY, Defendant–Appellant.**

No. 92–3858.

United States Court of Appeals, Seventh Circuit.

Argued June 11, 1993.

Decided Oct. 21, 1993.

Robert W. Kent, Jr., Asst. U.S. Atty. (argued), Crim. Div., Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Jay P. Deratany (argued), John Parrilli, Chicago, IL, for defendant-appellant.

Before EASTERBROOK and MANION, Circuit Judges, and ALDISERT, Senior Circuit Judge.*

MANION, Circuit Judge.

Thomas E. Macey sold bogus invoices to Sunmark Capital Resources (Sunmark) to gain needed cash for his failing company. He was caught and tried for mail fraud and wire fraud. At trial, the district court allowed one of Macey's former employees to testify that Macey had once filed false charges against him. The court determined that this testimony tended to show Macey's intent to defraud Sunmark, and was admissible under Federal Rule of Evidence 404(b). The court did not allow another one of Macey's employees to testify about a possibly mitigating statement Macey made four hours after the fraud, concluding that the statement did not fall within the hearsay exception of Federal Rule of Evidence 803(3). The jury returned a guilty verdict against Macey on six of the seven counts charged in the indictment, including count IV, involving a letter which Macey's co-conspirator drafted and sent. At sentencing, the district court increased Macey's criminal history category, based primarily on his filing false criminal charges against his former employee. Macey appeals and we affirm.

## I. Facts

Macey was the president and half-owner of Asbestos Real Estate Consultants, Inc. (ARC), a company which inspected buildings for asbestos and consulted with building owners concerning asbestos removal. When ARC discovered asbestos contamination in a building, another company, Three Way Environmental, Inc. (Three Way), was often called to perform the actual asbestos removal. Although no formal referral agreement existed between ARC and Three Way, they had a close business relationship; ARC found asbestos problems and Three Way fixed them. Three Way's president, David Souser, was friendly with Macey, and the two often talked about going into business together. In the summer of 1989, ARC provided Three Way with office space in its building.

Business boomed for ARC from early 1988 through the spring of 1989. Federal law required that all public schools be inspected for asbestos by April 1989. Due to the impe-

* Hon. Ruggero J. Aldisert, Senior Circuit Judge of the U.S. Court of Appeals for the Third Circuit, is sitting by designation.

tus of the government mandate, asbestos inspection businesses thrived. For a time, school administrators scrambled to comply with the federal law. By the spring of 1989, however, most schools had complied, and the demand for asbestos inspection services dropped off sharply.

To accelerate its cash flow, in March 1989, ARC entered into a contract with Sunmark. Basically, Sunmark agreed to pay cash for ARC invoices. ARC would offer to sell invoices for completed work to Sunmark, which would make appropriate inquiries to confirm that the invoices were legitimate. After verifying an invoice, Sunmark would immediately pay ARC seventy percent of its value up front. The debtor who owed on the invoice was then notified that payment should be made to Sunmark. When Sunmark eventually received full payment, it would pay a portion of the remaining thirty percent to ARC. Sunmark withheld an agreed-upon portion of the thirty percent as its fee for providing this financing service.

From April 1989 through August 1989, Sunmark purchased numerous legitimate invoices from ARC. During this time, the asbestos inspection business remained languid. ARC began having trouble paying its bills. In late August and the first week of September 1989, ARC's bank account had a negative balance. Macey then concocted a scheme to gain funds from Sunmark. Macey had his office manager, Kim Kaiser, execute an invoice in the amount of $97,000 for inspection services ARC claimed to have provided Three Way. The invoice identified three projects ARC purportedly worked on for Three Way: "Port Clinton," "Olds Center, State of Michigan," and "Records Danville." But, in fact, ARC had never done any of the work. Macey then had the sham invoice sent to Sunmark. When Sunmark attempted to verify it, David Souser, president of Three Way, related that ARC had provided the inspection services.[1] Successfully duped, Sunmark paid ARC 70% of the invoice—$67,900.[2]

Sunmark required Three Way to make its first payment for the invoice by October 7, 1989. Three Way never made this payment and Mark Kraus, Sunmark's general manager, began to investigate. Eventually, Kraus discovered the truth about the sham invoice. He immediately stopped payments to ARC on other invoices. On September 18, 1991, a grand jury returned a 7–count indictment charging Macey with mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343. The grand jury made minor changes in the original charges and issued a superseding indictment on February 14, 1992.

Before trial, the government filed a motion to introduce the testimony of Scott Plesniak, a disgruntled former ARC employee. In an offer of proof, Plesniak proffered that he had been an asbestos inspector for ARC, and he was paid one cent per square foot for conducting inspections. In February 1989, he left his job with ARC claiming the company owed him $30,000 for past inspection work. He threatened to hire a lawyer to recover his money. According to Plesniak, Macey then altered ARC work records to make it appear that Plesniak was wilfully exaggerating the square footage of each inspection in order to inflate his compensation. Macey presented these altered work records to state authorities, who arrested and charged Plesniak with theft from ARC. The charges eventually were dropped, because Macey failed to appear in court to prosecute Plesniak. The district court decided to allow this testimony during trial under Federal Rule of Evidence 404(b) to prove Macey's intent to defraud Sunmark.[3]

1. The indictment originally charged Souser as a co-conspirator with Macey. But Souser had brain surgery before trial, which resulted in a loss of memory. He did not appear as a witness at trial, and he has not been prosecuted.

2. Macey took the money which Sunmark gave ARC and paid $27,400 to one of his other companies, $5,300 to his wife, and $2,000 for the lease on his Jaguar XJ6.

3. Plesniak also proffered that, at about the same time, Macey filed false charges against him for stealing a company car. In fact, Plesniak never stole the car and the charges were dropped. The district court decided not to allow testimony about the stolen car charge at trial.

Trial was held on the superseding indictment from July 23–30, 1992. The government presented evidence that Macey had executed a false invoice for three projects which ARC in fact never performed. The government also presented Plesniak's 404(b) testimony over Macey's objection. The court provided the jury with two limiting instructions concerning this testimony, restricting its purpose to proof of Macey's intent to defraud Sunmark.

In his defense, Macey never attempted to argue that ARC actually performed the inspection work identified in the invoice. Instead, Macey argued that the invoice covered recordkeeping services which ARC did for Three Way. Macey never presented any work product generated by the recordkeeping services; rather, he called two witnesses—Sam Cosentino and Chris Lambesis—to bolster his argument. Cosentino, ARC's treasurer, testified that he had an "understanding" that ARC employee Evan Horton was paid for some recordkeeping work he performed for Three Way. Lambesis, an employee of a separate company, testified that he once delivered a copy of Three Way's daily log from a construction project to ARC. Macey also sought to elicit testimony from ARC office manager Kim Kaiser to support the recordkeeping defense. Kaiser proffered that about four hours after the invoice was executed she asked Macey what it covered and he answered that it was for recordkeeping services. The court disallowed this testimony as impermissible hearsay.

On cross-examination and rebuttal, the government picked apart Macey's recordkeeping defense. Lambesis acknowledged on cross-examination that the daily log he delivered to ARC was less than 100 pages long—hardly the source of a $97,000 recordkeeping bill. Evan Horton testified in the government's rebuttal that contrary to Cosentino's "understanding," he never performed recordkeeping services for ARC. He also testified that ARC's computers lacked the capacity for storing customer records. Kaiser testified that during her tenure as office manager, which ended in April 1990, ARC had never used its computers to do any recordkeeping work for Three Way.

After closing argument, the court instructed the jury on the seven counts of mail fraud and wire fraud charged in the indictment. Count IV concerned a fraudulent letter which co-conspirator Souser had sent to Sunmark. The letter referred to the work covered by the false invoice, thus creating the impression that the work actually had been completed. Even though Macey did not send this letter, the court instructed the jury that he was responsible for the actions of his co-conspirator. *See Pinkerton v. United States,* 328 U.S. 640, 647–48, 66 S.Ct. 1180, 1184–85, 90 L.Ed. 1489 (1946). The court provided the following instruction:

A conspirator is responsible for offenses committed by his fellow conspirators if he was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of or as a natural consequence of the conspiracy. Therefore, if you find beyond a reasonable doubt that defendant Thomas E. Macey was a member of a conspiracy at the time that one of his fellow conspirators committed the offense charged in Count 4, in furtherance of or as a natural consequence of that conspiracy, then you should find him guilty of Count 4.

The jury returned a guilty verdict on the first six counts charged in the indictment.

Before sentencing, the government filed a motion to increase Macey's criminal history category from I to III, pursuant to Guidelines Section 4A1.3. The government took the position that Macey's criminal history did not adequately reflect the seriousness of his past criminal conduct or the likelihood that he would commit other crimes. The district court increased Macey's criminal history category from I to II based on the government's assertions. The court relied primarily on the government's assertion that Macey had twice filed false charges against Plesniak. Macey's Guideline range was fifteen to twenty-one months. The district court sentenced Macey to twenty-one months of incarceration, followed by thirty-six months of supervised release. As a condition of supervised release, the district court ordered Macey to perform one-thousand hours of community service and to pay $29,000 restitution to Sunmark.

Macey appeals, making four arguments: 1) that the district court abused its discretion by allowing Plesniak to testify about Macey's prior bad acts; 2) that the district court abused its discretion by prohibiting Kaiser's testimony about Macey's statements made four hours after the invoice was executed; 3) that the district court erred by giving the Pinkerton instruction; and 4) that the district court erred by increasing Macey's criminal history category.

## II. Analysis

### A. 404(b) Evidence

As it turned out, the government had a solid case against Macey. It presented unrefuted proof that Macey executed a false invoice in order to defraud Sunmark. Macey's only defense was that he intended to perform unrelated recordkeeping services at the time he executed the invoice. He presented only scant testimonial evidence and no documentary evidence to support this theory. The immediate question, then, is why did the government present Plesniak's testimony? He had no knowledge about the relationship between ARC and Sunmark. His testimony was prejudicial. But the prosecutor's tactical decisions are not at issue. Our task is to determine whether the admission of Plesniak's testimony requires reversal of the conviction. Did the prosecutor, by hammering the extra nail into Macey's coffin, splinter the pine?

■ The government argued to the district court that Plesniak's testimony was admissible under Rule 404(b) to prove Macey's intent to defraud Sunmark. The district court agreed, and allowed the testimony to prove intent. We will find error in a district court's admission of evidence under Rule 404(b) only if the court abused its discretion. *United States v. Torres*, 977 F.2d 321, 325 (7th Cir.1992). "Generally, an abuse of discretion only occurs where no reasonable person could take the view adopted by the trial court. If reasonable persons could differ, no abuse of discretion can be found." *United States v. Fulford*, 980 F.2d 1110, 1114 (7th Cir.1992) (citation omitted).

The Federal Rules of Evidence treat evidence of prior bad acts with great suspicion. Rule 404 identifies the limited circumstances where such evidence may be introduced at trial. Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

We outlined a four-part test for applying Rule 404(b) in *United States v. Shackleford*, 738 F.2d 776, 779 (7th Cir.1984), and we have since applied that test in several cases. *See e.g., United States v. Smith*, 995 F.2d 662, 671 (7th Cir.1993); *United States v. Monzon*, 869 F.2d 338, 344 (7th Cir.1989); *United States v. Zapata*, 871 F.2d 616, 620 (7th Cir.1989). It is not necessary to repeat that test here. In this case, the government offered Plesniak's testimony to prove Macey's intent. Nobody disputes that intent was an issue in Macey's prosecution. *See e.g. United States v. Draiman*, 784 F.2d 248, 254 (7th Cir.1986) (mail fraud and wire fraud are specific intent crimes). Where the 404(b) evidence is offered to prove intent, the test requires that the prior bad act have some connection with the defendant's intent to commit the charged crime. Otherwise, the evidence tends to prove only a propensity to commit crime—that the defendant was a bad guy in the past and presumably still is.

The district court conceded only the slightest connection between Macey's scheme against Plesniak and the scheme against Sunmark: both were perpetrated to "benefit" ARC. But just because both schemes were intended to "benefit" the same corporate entity does not mean that the first scheme shows the intent to commit the second. We see no possible link between Macey's treatment of Plesniak and his intent to defraud Sunmark. If anything, Plesniak's testimony demonstrates only that, in a pinch, Macey was willing to break the law. That is exactly the type of evidence Rule 404 seeks to preclude. The evidence invites the jury to presume that because Macey broke the law

in a past business dealing, he did the same with Sunmark.

Even if we are missing some legitimate purpose the district court perceived for admitting Plesniak's testimony, it is not clear that the district court properly weighed the testimony's potential for unfair prejudice. Indeed, all 404(b) evidence presents the danger that juries will equate the prior bad act with the crime charged, and convict on the latter because of the former. In *United States v. Beasley*, 809 F.2d 1273, 1279 (7th Cir.1987), we acknowledged the inherent prejudicial nature of Rule 404(b) evidence, and noted its sometimes dubious probative value. We looked to the trial record to determine if the court "took the right things into account" when admitting the evidence. *Id.* Ultimately, we concluded that the district court had not—that the court's treatment of the issue was perfunctory.

The same is true in this case. In its brief, the government points the court to two pages of transcript which chronicle the court's consideration of the 404(b) evidence. The court chose to admit Plesniak's testimony during a brief hearing on the morning of trial. Nowhere did the court consider the prejudicial nature of Plesniak's testimony. Like in *Beasley*, "the court did not demonstrate an effort to determine the likely effect of the evidence in poisoning [the defendant's] character." *Beasley*, 809 F.2d at 1279. Therefore, the district court erred in admitting the 404(b) evidence.

■ Having found error, we next determine its consequence. We will not reverse for an evidentiary error if the error was harmless. *See* Fed.R.Crim.P. 52. "An error is harmless if the untainted incriminating evidence is overwhelming." *United States v. Manganellis*, 864 F.2d 528, 539 (7th Cir. 1988). Here, the government presented overwhelming evidence against Macey. The fraud was well-documented, and several witnesses confirmed its details. In his defense, Macey only insinuated an explanation (the recordkeeping defense) which, in the best light, was somewhere between incredible and weak. The district court twice instructed the jury as to the limited relevance of Plesniak's testimony. *See Monzon*, 869 F.2d at 344–45

(failure to give a limiting instruction on 404(b) evidence increases the likelihood that the jury "would use the evidence not as proof of the defendant's intent, but as pure propensity evidence."). The admission of Plesniak's testimony was harmless.

*B. Kaiser's Testimony*

■ Kim Kaiser was ARC's office manager. She signed the Three Way invoice for Macey at his direction. She testified during an offer of proof that, four hours after executing the invoice, she asked Macey what it was for, and he responded "recordkeeping services." Macey argues that the testimony was admissible under Federal Rule of Evidence 803(3). The court disagreed, and precluded the testimony as impermissible hearsay. Again, we must determine whether the court abused its discretion. We must ask whether "no reasonable person could take the view adopted by the trial court." *Fulford*, 980 F.2d at 1114.

Rule 803(3) creates an exception to the hearsay rule when the statement concerns "the declarant's then existing state of mind ... such as intent ... but not including a statement of memory or belief to prove the fact remembered or believed...." The Advisory Committee Note to Rule 803(3) states that the rule "is essentially a specialized application of Rule 803(1)." The Advisory Committee Note to Rule 803(1) explicitly requires a "substantial contemporaneity of event and statement [to negate] the likelihood of deliberate or conscious misrepresentation." Because of this, we require that statements offered under Rule 803(3) must be "contemporaneous with the ... event sought to be proven; [therefore] it must be shown that the declarant had no chance to reflect—that is, no time to fabricate or misrepresent his thoughts...." *United States v. Jackson*, 780 F.2d 1305, 1315 (7th Cir. 1986).

Macey claims that his statement shows that he never intended the invoice to be fraudulent—that he always intended it to cover recordkeeping services. But the statement was made four hours after the invoice was executed. The district court could have

reasonably concluded that Macey had time to fabricate a story in the four hours between his fraud and his statement to Kaiser. Because good reason existed for its decision, the district court did not abuse its discretion by precluding Kaiser's hearsay testimony.

### C. Pinkerton Instruction

The district court gave a slightly modified version of this court's pattern instruction entitled "18 U.S.C. § 2 Principles (Conspirator's Liability for Substantive Counts Committed by Co–Conspirators; Conspiracy Not Charged in the Indictment—Elements)." The instruction basically states the legal principle enunciated in *Pinkerton. See supra* at 6. Macey does not challenge the slight adjustments the district court made to the pattern instruction. Instead, Macey challenges the fact that the district court gave any kind of conspiracy instruction. He contends that such an instruction was inappropriate because the indictment did not charge conspiracy.

On appeal, our review of jury instructions is limited. We must determine "whether the instructions as a whole were sufficient to inform the jury correctly of the applicable law. . . ." *United States v. Villareal,* 977 F.2d 1077, 1079 (7th Cir.1992). We reverse only if the instruction misguides the jury so much that a litigant is prejudiced. *Goldman v. Fadell,* 844 F.2d 1297, 1302 (7th Cir.1988). We will not reverse if the instructions as a whole "fairly and adequately" treat the issues. *United States v. Durades,* 929 F.2d 1160, 1167 (7th Cir.1991).

■ Macey's argument is one of law. He asserts that a person cannot be liable for the acts of co-conspirators unless the indictment charges conspiracy. The Seventh Circuit Committee on Jury Instructions issued two instructions concerning *Pinkerton* liability: one to be used when the indictment charges conspiracy, and one to be used when it does not. *Seventh Circuit Jury Instructions,* Vol. III, p. 6–7 (1986). We have long recognized that "[i]t is not essential that the indictment contain a separate count charging conspiracy in order to take advantage of the doctrines peculiar to conspiracy." *United States v. Wilson,* 506 F.2d 1252, 1257 (7th Cir.1974), citing *United States v. Joyce,* 499 F.2d 9, 16 (7th Cir.1974). "[C]onspiracy doctrines apply to a multi-member mail fraud scheme even if the indictment does not charge conspiracy." *United States v. Wormick,* 709 F.2d 454, 461 (7th Cir.1983). *See also United States v. Dick,* 744 F.2d 546, 552 (7th Cir.1984). The jury instructions accurately stated the law. In a mail fraud case, a defendant is liable for the acts of his co-conspirator even if the indictment did not charge conspiracy. Therefore, the district court did not err in giving the instruction.

### D. Sentence

■ Macey finally argues that the district court erred by increasing his criminal history category in sentencing. A district court is allowed to increase a felon's criminal history category if "reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes. . . ." U.S.S.G., § 4A1.3. The government bears the burden to prove, by a preponderance of the evidence, the defendant's past criminal conduct warranting the upward departure. *United States v. Terry,* 930 F.2d 542, 545 (7th Cir.1991). " 'Prior similar adult criminal conduct not resulting in a criminal conviction' can be grounds for an upward departure." *Id.* quoting U.S.S.G. § 4A1.3. Indeed, "it is prior criminal *conduct,* and not prior *charges,* that supports a departure." *United States v. Ruffin,* 997 F.2d 343, 346 (7th Cir.1993).

The district court relied upon several instances of past criminal conduct to increase Macey's criminal history category. The court was especially troubled by the fact that Macey twice filed criminal charges against Plesniak. The government proved the fact that Macey filed false charges by presenting Plesniak's own testimony. In *United States v. Spears,* 965 F.2d 262, 278 (7th Cir.1992), we set forth the framework for analyzing increases in criminal history categories:

> [W]e begin with a de novo review of the court's stated grounds to ascertain that they are a kind that may be relied on to justify a departure. If they are, we then

review the facts underlying the departure, and will reverse the district court only if its factual findings were clearly erroneous. Finally, we review the degree of departure to determine if it was reasonable, giving considerable leeway to a sentencing court's determination of what Criminal History category most accurately reflects the defendant's actual criminal history. [Citations omitted].

In this case, we first ask whether the filing of false criminal charges against a former employee to scare him into not filing suit against a financially strapped company is the kind of criminal conduct that justifies a departure. The question answers itself. Certainly, such mean-spirited illegal conduct—if it really happened—would justify departure. Next, we review the facts underlying the departure. The district court was satisfied that Plesniak's testimony established criminal conduct by a preponderance of the evidence, and we review that determination under a clearly erroneous standard. "A finding of fact is clearly erroneous only if, after reviewing all of the evidence, the appellate court is left 'with the definite and firm conviction that a mistake has been committed.'" *United States v. Brown*, 900 F.2d 1098, 1102 (7th Cir.1990), quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). We conclude the district court did not clearly err in believing Plesniak's uncontested story. Therefore, we uphold the district court's decision to increase Macey's criminal history category. Macey does not contest the degree of departure. We note, however, that the district court only departed slightly, and that slight departure was appropriate.

### III. Conclusion

The district court erred in allowing Plesniak's testimony at trial, but that error was harmless. The district court did not err in precluding Kaiser's hearsay testimony, nor in providing the *Pinkerton* conspiracy instruction. Also, Plesniak's testimony supported the district court's slight departure in sentencing. Therefore, Macey's conviction and sentence are

AFFIRMED.