KONENKAMP, Justice
(dissenting).
[¶ 44.] Judicial decisions on children’s lives deserve our highest effort. Here is no place for perfunctory procedure. For this reason, I cannot endorse the trial court’s flawed process. Although the court at the close of trial issued an oral decision from the bench, which remarks form part of the written findings, much of the findings the court later signed as proposed by winning counsel reflect not the expression of independent judicial thought but the rhetoric of adversarial excess.
[¶ 45.] If trial courts fail to “make careful study of the suggested findings in all their bearings before making them official, [it] is quite liable to lead to bad results.” Harrigan v. Gilchrist, 121 Wis. 127, 99 N.W. 909, 993 (1904). The fact findings and conclusions this Court points to as exemplifying a sound decision were, in substance, largely conceived by the winning side. With the exception of three hand-written stylistic changes the trial court made, all the findings proposed by the father’s attorney were adopted verbatim. Many of these findings are overreaching and, in several instances, wholly self serving.
[¶ 46.] Of all the cases on a trial court’s docket, child custody disputes may be the most difficult and contentious. Yet judges must remain above the fray. “Balanced and methodical,” a judge’s custody decision should reflect impartial patience and careful deliberation and be couched in the court’s own dispassionate language. Fuer-stenberg v. Fuerstenberg, 1999 SD 35, ¶ 35, 591 N.W.2d 798, 810. Findings tainted with one-sided excess fail to promote the appearance of neutrality and fairness.
[¶ 47.] Under our rules of civil procedure, “In all actions tried upon the facts without a jury ..., the court shall ... find the facts specially and state separately its conclusions of law thereon.... ” SDCL 15-6-52(a). “Alternatively, the court may direct counsel for the prevailing party to prepare findingsf,]” and, upon expiration of the applicable time limits for proposed findings and objections, “the court shall make or enter such findings and conclusions as may be proper.” SDCL 15-6-52(a) (emphasis added). By using the term “as may be proper,” the rule contemplates that judges will study the proposed findings, eliminate everything not suitably a part of the determination, add what may have been self-servingly left out, and ensure that all material facts and applicable laws are covered. In the end, attorneys can draft findings for the court; they cannot make findings for the court.
[¶ 48.] Certainly we have held that absent “becoming a judicial rubber stamp,” a court has the “discretion to adopt those findings of fact and conclusions of law which it deems most appropriate, regardless of their source.” See Feldhaus v. *848 Schreiner, 2002 SD 65, ¶ 14, 646 N.W.2d 753, 757. But uncritical acceptance of lawyer-prepared findings can never be condoned, and Feldhaus should not be read as an unreserved endorsement for a trial court signing verbatim findings prepared by the prevailing party. Indeed, in Fel-dhaus, we cited with approval a case suggesting that appellate courts should scrutinize more carefully and give less weight to findings prepared by counsel than those findings prepared by trial judges themselves. Id. (citing Leftwich v. Leftwich, 442 A.2d 139 (D.C.1982)); see also Shapiro v. Reg’l Bd. of Sch. Trustees of Cook County, 116 Ill.App.3d 397, 71 Ill.Dec. 915, 451 N.E.2d 1282, 1287 (1983).
[¶ 49.] There are good reasons why our rules require trial courts to “find the facts specially” and “state separately” their conclusions of law, or to take only those proposed findings and conclusions “as may be proper.” See SDCL 15-6-52(a). It is a recognition that decision making is a process, not simply a result. Trial judges who formulate their own findings and conclusions can be satisfied that they have fully and fairly dealt with all the issues before deciding a case. See Roberts v. Ross, 344 F.2d 747, 751 (3d Cir.1965), superseded in part as recognized in Lansford-Coaldale Joint Water Auth. v. Tonolli Corp., 4 F.3d 1209 (3d Cir.1993). And, just as important, the litigants and the reviewing court can know that the judge thoroughly considered all the relevant facts and issues involved.
[¶ 50.] Careful attention to the findings offers the assurance, as Judge Wisdom wrote, “that the trial judge did indeed consider all the factual questions thoroughly and would guarantee that each word in the finding is impartially chosen[.]” Roberts, 344 F.2d at 752 (citing Louis Dreyfus & Cie. v. Panama Canal Co., 298 F.2d 733, 738 (5th Cir.1962)). On the other hand, if a judge “rubber-stamps the findings and conclusions presented by the winning party ... it is indeed winning counsel who has disposed of the case in a manner that he thinks will be most advantageous to his client and least subject to successful attack on appeal.” In re the Marriage of Jensen, 193 Mont. 247, 631 P.2d 700, 706 (1981) (Shea, J., concurring).
[¶ 51.] So it is here that although the trial judge did not exactly “rubber stamp” counsel’s proposed findings, many of the findings nonetheless reflect such imbalance that they cast substantial doubt on the court’s process.[2] A few extracts from the trial court’s findings will suffice to demonstrate this concern. In its bench decision, the court said, “I don’t think evidence suggests one or the other is a better parent. In fact, the evidence from Dr. Clayborne is that they would both be excellent parents and are excellent parents.” But the written findings declare the father to exhibit “the greatest parental fitness in regard to an ability to provide the primary care for these children.” According to finding 86, the mother, in her handling of visitation, was guilty of “harmful parental misconduct which has been detrimental to the children .... ” But in its bench comments, the court said nothing about the children having exhibited any detriment, and the record is barren of such evidence. According to the neutral custody evaluator’s personal observations, “the children are bonded and have a good relationship with both parents. *849 They appeared comfortable and safe while in the care of each of their parents.”
[¶ 52.] During the custody investigation process, the mother expressed concern about the father and his fiancé smoking in the presence of the children. In the findings, we read that “the court finds that [the mother’s] accusations in regard to smoking around the children were made in an effort to justify further limitation of [the father’s] visitation and contact with the children.” Yet, at trial, the father admitted that he and his fiancé both smoked. He testified: “We never smoked in the house. Shellie and I have subsequently quit smoking.” He assured the court that he knew it “was not a healthy thing[.]” Why, then, would the mother’s concern about this translate into a finding of obstruction? How would she know whether the father and his fiancé were still smoking and where?
[¶ 53.] The findings contain more of these one-sided inferences and contrived inadequacies. In the latter part of finding number 75, for example, the court announces there is “little evidence to indicate that the children have a strong relationship with any of [the mother’s] extended family.” Fact findings should be based on fact, obviously, having some connection to the evidence produced at trial. No evidence supports this finding. Not the custody evaluation. Not even the father’s testimony.
[¶ 54.] Repeatedly, in connection with visitation, we see language in the findings describing the mother as having “demonstrated a pattern,” “a profound lack of ability or willingness,” a “pronounced inability or willingness,” all raising “serious concerns,” manifesting “deficiencies.” But nowhere in the findings is there a single statement that the mother violated any court order on visitation. She is faulted for not granting the father “additional” or “extra” time with the children. And even though it was beyond contention that the children were “more closely attached” to the mother, especially the twins, such was deemed in the findings to be a “minimal advantage.”
[¶ 55.] In the spring of 2005, the father was arrested for domestic assault on the mother. He later received a deferred sentence on a reduced charge of disorderly conduct. The mother testified at trial that she thought the father was going to kill her. Apparently unsure, the court, when it commented on this at the close of trial, remarked that “none of us will ever be able to fully sort out what happened that night.” Yet as crafted by the father’s attorney, the court’s finding number 43 proclaims: “The evidence suggests that both parties were most likely at equal fault during the disturbance which led to [the father’s] arrest.”
[¶ 56.] Initially, there was a restraining order, but it was eventually lifted. That summer, divorce proceedings commenced in the Iowa courts, and the mother, an M.D., moved to Sioux Falls to begin a medical residency. On November 29, 2005, she gave birth in Sioux Falls to twin girls, Faith and Grace. During these times, by the parents’ own admissions, they were unable to talk with each other. Communication between them was “primarily by means of email.” As the custody evaluator testified, “[T]he communication between these two people is jush-is just non-existent. It’s just not there. I think they both tend to hear things from their own vantage point, and that is a major-of a major concern.” Yet the findings, while acknowledging that “both parents have experienced some difficulty with the commu *850 nication between one another,” heap the blame for lack of communication on the mother and deduce that it was all done to deny the father contact with the children.
[¶ 57.] More disturbing are the findings on the mother’s decision to nurse the parties’ twin daughters. Even infant nursing was portrayed in the court’s findings as an obstruction. Finding number 97:
[The mother’s] decision to nurse the children was taken to an extreme, and she perceived her interest in nursing the children as superior to that of [the father’s] right to develop a meaningful relationship with the children at an early age. [The mother] failed to pursue reasonable alternatives or supplements to the breast feeding, which alternatives would have not interfered with [the father’s] relationship with the children.
This finding does reflect the court’s rather uninformed oral remarks. The court said, “I see no reason why these children should not have been able to travel and spend significant time in overnight visits with their father within weeks of their birth.”
[¶ 58.] First of all, the father was living in West Des Moines, almost three hundred miles from Sioux Falls, and he did see the girls when he came to pick up or drop off their older son, Dylan. His contention was that visiting the girls in a hotel lobby for an hour every two weeks was not sufficient. Clearly that was inadequate time. But it was the father who testified that at his insistence he needed “the exchanges to occur in a public location.” Hence they agreed to meet in a hotel lobby.
[¶ 59.] Second, for over a year after their birth there was no court order in place regarding visitation for these infants. If there had been an order entered in accord with South Dakota’s shared parenting guidelines, the father would have been able to see his daughters more, especially as they grew older, but he would not have been able to take these nursing infants to West Des Moines “to travel and spend significant time in overnights visits.” See SDCL ch. 25-4A (Appendix A, Guidelines 2.2 and 2.3).
[¶ 60.] In fact, when the case finally came up for a hearing on interim visitation, another circuit judge heard the matter in December 2006 and noted that extended overnight visitation for these babies was not practical: “If you folks were living within a few miles, ten, fifteen, twenty miles of each other, the court would be looking at contact anywhere from two to three times a week or for two or three hours at a time, and even depending upon the relationship that exists, maybe an overnight visit. But that’s not realistic here.” Nonetheless, despite our guidelines and the other judge’s ruling, the mother’s “extreme” nursing became yet another ground in the courts findings to justify placing primary physical custody with the father.
[¶ 61.] Most troubling are those matters absent from the findings. On October 18, 2007, the trial court appointed a neutral child custody expert, Dr. Andre B. Clayborne, to perform a home study evaluation. Dr. Clayborne’s single-spaced, twenty-two page report was completed on May 26, 2008. He thoroughly examined the children’s situation, the parents’ history, and their psychological profiles. Separate testing was conducted, collateral contacts were reviewed, and the parents’ assessments of each other’s capabilities were explored. In preparing his report, Dr. Clayborne conducted home visits with the children at both the mother’s home in Sioux Falls and the father’s *851 home in West Des Moines. He found the children to be bonded to both parents. In the final analysis, however, he recommended that the mother “continue to be the children’s primary care parent,” with the father receiving liberal visitation. He also noted that he “did not find any information which would suggest the children would significantly benefit from a change in custody.” Quite the opposite, according to Dr. Clayborne, “there was information suggestive that separating the children from their primary caregiver may actually be detrimental to them.”
[¶ 62.] To be sure, no court is bound by a custody evaluator’s recommendation. We have long held that decision makers are entitled to disregard an expert’s opinion if it is found to be unworthy of credence. Still, the reasons for having a court-appointed professional custody evaluation are compelling. Experienced evaluators can assist judges in piercing the facade parents sometimes display in court. Observing children interacting with their parents in their homes opens a door through which judges themselves cannot enter. In a courtroom setting, only a few hours may be available to assess parenting abilities, a poor substitute for the on-the-ground comprehensive view a professional custody evaluator can provide.
[¶ 63.] One would expect, therefore, that before a court disregards a custody recommendation from its appointed expert, the court would at least make findings explaining its reasoning. After all, neither side questioned Dr. Clayborne’s credentials or the quality and accuracy of his evaluation process. In the attorney-prepared findings, though, no mention of Dr. Clayborne’s ultimate custody recommendation can be found, much less any explanation for why it was rejected. How does a balanced and methodical decision maker justify not even considering the custody recommendation made by the court’s own appointed expert?
[¶ 64.] Unquestionably, there was testimony by the father on his frustrations in communicating with the mother on all matters dealing with their children. Even if the court accepted these grievances undigested, to base the decision on one issue— inability to agree on childcare and visitation — is to ignore the totality of factors a court should examine as set forth in Fuer-stenberg. Those factors were recited in the findings, but the decision hinged on the mother’s perceived obstruction. “Child custody disputes should not be decided solely on a listing of faults ascribed to one parent[.]” Fuerstenberg, 1999 SD 35, ¶ 23, 591 N.W.2d at 807. To reason that because the mother, the primary caregiver, was recalcitrant on visitation custody must be awarded to the father is to pose a false choice. With these non-communicating parents, no matter which parent had primary custody, a rigid visitation schedule was going to be necessary. Besides, the concerns the father brought up about the mother obstructing his relationship with the children were not borne out in the custody evaluation. In fact, Dr. Clayborne testified that the father’s animosity toward the mother “makes me hesitate just a little bit” about whether he would foster a healthy relationship between mother and children. But, Dr. Clayborne thought “he probably would.” As for the mother, Dr. Clayborne had no hesitancy.
[¶ 65.] Despite my grave reservations about the trial court’s decision, I cannot say that the court’s ultimate ruling on custody was wrong. If Dr. Clayborne’s evaluation deserves any consideration, it must be acknowledged that while he did *852 testify that “making a change at this point might be more concerning and could be potentially damaging to the kids,” he also said, “I don’t think the court would err in placing these kids in either parent’s primary care.”
[¶ 66.] Nonetheless, the process used in rendering this decision was flawed. True, our standard of review is abuse of discretion, and choosing between two satisfactory parents “falls within a judge’s discretion.” Arneson v. Arneson, 2003 SD 125, ¶ 14, 670 N.W.2d 904, 910. But that does not end our inquiry on appeal. If it did, then every custody dispute between fit parents would be unreviewable. One way to discern whether a court made a wrong decision is to examine the process the judge used in making that decision. “A flaw in the process is easier to detect than a flaw in the result[.]” United States v. Beasley, 809 F.2d 1273, 1279 (7th Cir. 1987). “The principled and just functioning of the judicial system depends on careful observation of the rules that focus attention on the proper grounds of decision.” Id.
[¶ 67.] Did the circuit court focus attention on the proper grounds for decision? Failing to do so, by definition, constitutes an abuse of discretion. Willoughby v. Grim, 1998 SD 68, ¶ 6, 581 N.W.2d 165, 167-68 (citations omitted). To answer this question, all we can appropriately review are the stilted findings and conclusions entered here. Far from being balanced and methodical, these findings offer little assurance that the court gave impartial consideration to all the relevant circumstances.
[¶ 68.] We are all prone to error in making difficult decisions, and the press of heavy caseloads can be difficult, but for the sake of a process that aspires to truth and accuracy, decisions should be couched in the language of the decision makers, reflecting their own independent observations and reasoning. Our judicial process is demeaned when a court adopts overreaching and unwarranted findings prepared by counsel for the winning side.

. The court handwrote the following changes in the findings: Finding 97, added “or supplements.” Finding 99, added "and does so find” and "further.” Finding 101, added "reasonable and liberal.”