**UNITED STATES of America**

v.

**William J. GERARD, Sr.**

**No. 96 CR 98.**

United States District Court,
N.D. Illinois,
Eastern Division.

May 21, 1996.

Chris C. Gair, Michelle Reese Andrew, Freeman, Freeman & Salzman, P.C., Chicago, IL, James Andrew Graham, Law Offices of James A. Graham, Chicago, IL, Kaaren M. Plant, Chicago, IL, for William J. Gerard, Sr.

Kaaren M. Plant, Chicago, IL, for William J. Gerard, Jr.

Jacqueline O. Stern, United States Attorney's Office, Chicago, IL, for the U.S.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Defendant William J. Gerard, Sr. is charged in a six-count indictment alleging mail fraud in violation of 18 U.S.C. § 1341 (Counts I, III, and V) and interstate transportation of property acquired by means of conversion or fraud in violation of 18 U.S.C. § 2314 (Counts II, IV, and VI).[1] As will be explained more fully below, the indictment alleges that after negotiating a $2 million settlement on behalf a medical malpractice client in 1993, and while acting as a trustee of that client's trust, Gerard converted funds belonging to her and then attempted to conceal the conversion by falsely representing that the funds had been used for legitimate expenses and fees. Pursuant to Fed.R.Evid. 404(b), the government moves for the admission of certain evidence relating to three prior uncharged incidents in which Gerard allegedly (1) charged excessive fees for his legal services in 1985, (2) improperly collected a fee for legal services that he was not authorized to take in 1987, and (3) misused funds held by Gerard as escrowee in connection with a real estate closing in 1992. The government seeks to introduce evidence as to these three incidents as proof of intent, preparation, plan, knowledge and absence of mistake or accident. For the reasons that follow the government's motion is denied.

## BACKGROUND

*Indictment*

The indictment in this case alleges the following relevant facts. Gerard and his son, Gerard Jr., had their own law firm. In late 1991, Ethel Lawson retained the Gerards to represent her in a medical malpractice lawsuit. In or about February 1993, Lawson's medical malpractice case was settled for $2 million and the Gerards deposited the $2 million settlement check into their Client's Funds Account at a Chicago Bank. The government alleges that under Illinois law and the terms of Lawson's retainer agreement, the Gerards were entitled to $462,500 in attorneys' fees and that additional attorneys' fees could be collected by the Gerards only by court order.

The indictment further alleges that the Gerards converted and misused monies belonging to Lawson without her authorization and then attempted to deceive Lawson by misrepresenting that they had used the money for legitimate expenses and fees. Specifically, on February 5, 1993, the Gerards became the trustees for a trust they had previously established for Lawson. By becoming trustees, the Gerards were able to convert and misuse Lawson's funds. The Gerards allegedly attempted to conceal from the state trial court that they would be acting as Lawson's trustees without supervision, and allowed the trial court to believe that a bank would also be acting as trustee.

On February 23, 1993, the Gerards each deposited $450,000 (for a total of $900,000) from the settlement proceeds into their own personal accounts and deposited an additional $100,000 into their Clients' Funds Account. The remaining $1 million from the settlement proceeds were deposited in Lawson's trust fund account. The indictment further alleges that the Gerards converted approximately $35,500 of Lawson's money which they were holding in their Clients' Trust Funds Account and used that money to pay two attorneys who had worked on the Lawson matter—a debt allegedly owed by the Gerards, not Lawson. Gerard Sr. also allegedly used Lawson's money to pay for numerous telephone calls, made on a cellular phone, that had nothing to do with the Lawson matter or Ethel Lawson's interests.

In April of 1993, after Lawson raised questions about the $2 million settlement proceeds, the Gerards attempted to conceal their

---

1. The indictment also named Gerard's son, William J. Gerard, Jr. ("Gerard Jr."), as a codefendant, charging Gerard Jr. with the same offenses. On April 2, 1996, Gerard Jr. entered into a plea agreement with the government, wherein he entered a voluntary plea of guilty to one count of interstate transportation of stolen goods in violation of 18 U.S.C. § 2314.

misuse and conversion of her funds by giving her a document which they represented to be a true and accurate accounting of the settlement proceeds, but which, in fact, contained false and fraudulent information concerning the expenses paid by the Gerards, the fees incurred by the Gerards as trustees, and the amount of money being held by the Gerards for Lawson. Also, on April 27, 1993, the Gerards made false and fraudulent representations to the state court in order to obtain a court order granting them extraordinary attorneys' fees totalling $666,666 for their work on Lawson's malpractice suit. In seeking additional fees, the Gerards attempted to deceive the state court by making false and misleading statements concerning the impact of Lawson's case on their ability to handle other matters and concerning the litigation expenses paid by the defendants. Also, after a state court ordered the Gerards to file an accurate accounting of Lawson's money, Gerard attempted to conceal his misuse and conversion of Lawson's money by submitting pages from his business diary that had been altered so as to reflect that a larger amount of time had been spent on trust matters than was originally entered.

The indictment's mail fraud counts relate to conduct by the Gerards in causing a bank document (Count I), a dividend check (Count III), and a mobile phone bill (Count V) to be delivered by mail in execution of their scheme to defraud Ethel Lawson. The interstate transportation of stolen goods counts all relate to conduct by the Gerards in causing checks, representing Lawson's money, to be mailed interstate, knowing that money had been converted or obtained by fraud.

*Proposed 404(b) Evidence*

(1) Ruth Randolph

The following facts relating to Gerard's prior conduct with a client named Ruth Randolph are drawn from the Illinois Supreme Court's opinion affirming Gerard's one-year suspension from the practice of law. *In re Gerard,* 132 Ill.2d 507, 139 Ill.Dec. 495, 548 N.E.2d 1051 (1989). In 1985, Ruth Randolph, who was 84 years old at the time and in the hospital as a result of injuries suffered in a fall, asked Gerard to prepare a will for her. She also asked Gerard to help her find certain paper assets that she owned and which were missing. She told Gerard over the phone that she believed someone at the hospital had taken them. Over the phone, Gerard discussed with Randolph his fee for "recovering" the missing assets, indicating that he could charge a fixed rate of $175 per hour, or they could enter into a contingent fee. Randolph said she preferred a contingent fee agreement. On August 20, 1985, Gerard met with Randolph and presented a document he had prepared as the contingent fee agreement. The document—which was the first contingent fee agreement Gerard had drafted in his then 24 year career— stated: "This is to confirm my understanding that William J. Gerard Ltd. will receive as a retainer an amount equal to one-third of all assets recovered for the undersigned." Although this was the first contingent fee agreement Gerard had ever drafted, he did not consult any form books or any other reference sources. However, Gerard had served on the Chicago Bar Association's Professional Fees Committee for four years.

At the time of drafting the agreement, Gerard did not know the nature of the assets, their value, or the complete circumstances of their disappearance. Some of these details were filled in at the meeting of August 20, at which time Randolph informed Gerard that the assets were certificates of deposit that she held in seven financial institutions which she named. Gerard still did not know the number of CDs involved or their value.

At the August 20 meeting, Gerard and Randolph also agreed that Gerard would prepare a trust agreement and a will with a pour-over provision. Gerard and Randolph would be named as co-trustees. Gerard advised Randolph to place stock she owned as well as the CDs, if recovered, into the trust and Randolph accepted this advice. When Gerard left that day, he left the continent fee agreement with Randolph. He met with Randolph two days later so that she could execute the will and trust agreement that he had prepared. Randolph also gave Gerard the contingent fee agreement which she had signed.

During the next month, Gerard contacted all seven of the financial institutions Randolph had named as having issued her CDs. Gerard found that all of Randolph's CDs were still safe in accounts under Randolph's name. Gerard also discovered that the total value of the certificates was approximately $450,000.[2] On September 26, 1985, Randolph gave Gerard a list of the banks she had named on August 20 and the number of CDs which each bank held for her, for a total of 23. This information corresponded with that obtained by Gerard through his inquiries to the banks.

Having identified all of the "missing" CDs, Gerard re-registered each of them in the name of the trust he had established for Randolph. Gerard accomplished all of his work relating to these CDs by telephoning, visiting and writing letters to the banks and by meeting with Randolph. At no time were any adverse claims made by third parties, nor was litigation ever required. Gerard claims to have spent 160 hours within a period of two months "recovering" the CDs.

Gerard began collecting his contingent fee on October 10, 1985, when he redeemed two CDs, now registered in the Randolph trust's name, and deposited the money in his corporate account. Gerard redeemed eight more CDs over the course of the next three months. On January 10, 1986, Gerard redeemed the tenth CD, which because it was unmatured was reduced by a penalty of $225, and deposited the resulting sum of $40,275 in his corporate account. By redeeming these ten CDs, Gerard collected a total fee of $159,648.60, which exceeds one-third of the $453,443.37 value of the CDs "recovered" by Gerard. The previous day, Randolph signed a document revoking the trust agreement and instructing Gerard, as co-trustee, to deliver to her all trust assets and trust documents, and to render an accounting for all transactions made during the trust's existence. Randolph mailed this revocation to Gerard, who states that he did not receive it until January 14, 1986.

Gerard delivered all the requested documents to Randolph on or about January 31, 1986. At the same time Randolph signed a

release prepared by Gerard, which stated that Randolph acknowledged the return of the trust assets and released Gerard from "all claims in connection with the trust."

Randolph died seven months later. The executrix of Randolph's estate filed a complaint with the ARDC regarding Gerard's $159,648.60 fee. She also commenced in action in the Circuit Court of Cook County seeking the return of the fee. Gerard settled the civil action in November of 1987 (four months after the Administrator of the ARDC filed a complaint charging Gerard with misconduct). Under the terms of the settlement, Gerard's fee was renegotiated down to $28,000, which represents 160 hours of work at Gerard's $175 hourly fee. Accordingly, Gerard repaid the estate $131,648.60 plus interest. The settlement agreement included a release of claims whereby the executrix released all claims arising out of Gerard's representation of the estate. A clause in the settlement agreement provides states that "Gerard has asserted and continues to assert a right to said fees paid to him based on the terms of a disputed contingency contract...."

An ARDC Hearing Board panel conducted a hearing at which Gerard and two character witnesses testified. The panel found that Gerard's $159,648.60 fee was excessive and predatory, and that Gerard had engaged in conduct involving dishonesty, fraud and deceit. The panel recommended that Gerard be suspended from the practice of law for six months. Both Gerard and the ARDC Administrator filed exceptions with the Review Board. The Review Board accepted the panel's findings and conclusions of law, but it increased the severity of the recommended sanction to a one-year suspension. The Review Board also made two of its own conclusions: (1) Gerard's conduct was extreme overreaching and (2) Gerard acted fraudulently when he entered into the fee agreement because at that time there were no assets to be recovered. Significantly, however, neither the Review Board nor the Hearing Board made any factual finding that Gerard knew this at the time of entering into the

---

2. The actual value turned out to be $453,443.37.

fee agreement. On appeal to the Illinois Supreme Court, the Court found that Gerard had charged an excessive fee, and suspended Gerard from the practice of law for one year.

The government seeks to introduce the factual statement contained in the Illinois Supreme Court's opinion as well as portions of the opinion relating to an attorney's duties and ethical obligations.

### (2) Pauline Armstrong's Estate

Gerard served as the attorney for the estate of Pauline Armstrong, who died in 1987. According to Michael Snyder, who was the executor of the Armstrong estate (and was Gerard's former partner), Gerard had to and ordinarily did submit his bills to Snyder in order to receive payment for services rendered to the estate. Gerard was not authorized to pay himself any monies from the estate without permission from Snyder. In December of 1988, Snyder became concerned about the amount of money being billed by Gerard as fees. So, he told Gerard that he wanted to see more specific information concerning the services that had been rendered.

In connection with the administration of the Armstrong estate, certain real property was sold in December of 1988. Gerard submitted bills for the services he rendered in connection with the sale, and Snyder paid those bills. After the closing, Snyder asked to see the closing documents, which Gerard provided. Upon review of the documents, Snyder discovered that Gerard had received $9,000 from the proceeds of the sale, which Gerard had paid to him directly at the real estate closing rather than causing the money to be paid to the estate. Gerard had not previously informed Snyder that he had structured the closing in such a manner that the $9,000 would be paid to him directly, nor was Gerard otherwise authorized by Snyder to take that money.

After discovering the $9,000 payment, Snyder met with Gerard and fired him from his position as the estate's attorney. Snyder told Gerard that he would have to report the matter to the Illinois Attorney Registration and Disciplinary Commission (ARDC). Gerard asked Snyder not to report the matter, and after talking to his client Snyder decided not to report it. Snyder told Gerard to repay the $9,000. Gerard repaid $4,000.

### (3) Elaine Tsiros

In December, 1992, Elaine Tsiros wrote a $5,000 check made payable to "William J. Gerard, Escrowee." The check was intended as an earnest money deposit in connection with a real estate transaction.[3] The check was deposited into Gerard's Client Funds Account. She did not authorize the use of that money for any other purpose prior to the closing of the real estate transaction. By the end of December 1992, Gerard's Client Funds Account had only $534.14 in it; and, by April 7, 1992, the account contained only $21.96. On April 7, 1992, Gerard wrote two checks totalling $5,000, both of which were drawn on Gerard's personal checking account and included notations indicating that the checks related to the D'Cruz matter. The real estate transaction ultimately did not close and on April 11, 1992 Gerard wrote a check, drawn on his Client Fund Account for $5,000, payable to Tsiros' attorney for the purpose of returning Tsiros' earnest money deposit. The government contends that this incident evidences Gerard's previous conversion of money that was entrusted to him and his efforts to conceal that conversion.

### ANALYSIS

*Fed.R.Evid. 404(b) Standards*

■ Federal Rule of Evidence 404(b) provides in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

FED.R.EVID. 404(b). Thus, as the first sentence of this rule makes clear, the govern-

---

3. Tsiros, who was not a client of Gerards, was the nominee of a real estate developer who was purchasing property from an individual named D'Cruz who was represented by Gerard. Def.'s Resp. at 13.

ment may not introduce prior bad act evidence in order to show that the defendant's character is consistent with a propensity to commit the crime in question; but, such evidence may be properly admitted as evidence of intent and absence of mistake or accident, among other things. *United States v. Wilson,* 31 F.3d 510, 514 (7th Cir.1994); *United States v. York,* 933 F.2d 1343, 1349 (7th Cir.1991).

■ In determining the admissibility of prior bad act evidence, the Court employs a four-factor inquiry which asks "whether the evidence (1) is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) is sufficient to support a jury finding that the defendant committed the similar act, and (4) has probative value which is not substantially outweighed by the danger of unfair prejudice." *United States v. Gregory,* 74 F.3d 819, 822 (7th Cir.1996); *United States v. Lloyd,* 71 F.3d 1256, 1264 (7th Cir.1995). With these criteria in mind, we now consider the government's proposed Fed.R.Evid. 404(b) evidence. We pause to note, however, that in several instances the government indicates that the relevance of its proposed evidence derives from anticipated defenses (*e.g.,* mistake, accident, lack of knowledge). Thus, the Court is presented with the difficult, if not impossible, task of assessing the relevance of evidence to an issue that is only vaguely identified to the Court. Accordingly, the Court's rulings on the instant pretrial motion must be regarded as preliminary and subject to reconsideration in light of the evidence that develops at trial.

(1) *Ruth Randolph*

(a) *Factual Statement*

The government seeks to introduce evidence of Gerard's conduct in the Randolph case as evidence of intent and/or absence of mistake or accident in the Lawson matter. Specifically, the government wishes to introduce the factual statement from the Illinois Supreme Court's opinion.

■ The offense of mail fraud is a specific intent offense, *United States v. Hickok,* 77 F.3d 992, 1003 (7th Cir.1996); and, where intent "is a material element to be proved by the government, it is necessarily in issue and the government may submit evidence of other acts in an attempt to establish the matter in its case-in-chief, assuming the other requirements of [Federal Rules of Evidence] 404(b) and 403 are satisfied." *United States v. Shackleford,* 738 F.2d 776 (7th Cir.1984); *see also United States v. Macey,* 8 F.3d 462, 466 (7th Cir.1993). Thus, the government's proposed use of the evidence concerning the Randolph matter is proper under Rule 404(b). However, the government "must show the relevance of the evidence to the question of intent. It cannot simply flood the courtroom with other-crimes evidence on the grounds that the crime was one of specific intent." *United States v. Manganellis,* 864 F.2d 528, 533 (7th Cir.1988) (quoting *United States v. Chaimson,* 760 F.2d 798, 813 (7th Cir.1985) (Cudahy, J. concurring)).

■ In this sense, the analysis required under Fed.R.Evid. 404(b) must be more than merely inquiring if an exception is applicable and then automatically allowing in all evidence that seemingly fits into the exception. Thus, the proper analysis is more than mechanically attempting to fit a square peg into a square hole. *See United States v. Leight,* 818 F.2d 1297, 1302 (7th Cir.1987). Instead, Rule 404(b) must be implemented as a rule of prohibition with certain limited exceptions. The Court therefore views its role as one of a "gate-keeper" similar to the non-involved role that judges have with respect to expert witnesses. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[4]

---

4. One reading the Fed.R.Evid. 404(b) jurisprudence might gain the mistaken impression that the exceptions have in effect swallowed the general rule of exclusion. However, the Court is mindful of the fact that most exclusions of evidence under the rule do not result in published opinions. Instead, it is usually the admission of Fed.R. 404(b) evidence by the trial court that leads to published opinions at the appellate level. In that vein, this Court will publish this opinion in the hopes of eliminating this misconception.

In its defined gate-keeping role, the Court must reject the government's arguments regarding the Randolph evidence. The Court specifically finds that Gerard's conduct in the Randolph case is not sufficiently similar to the charged conduct to be relevant to the issue of his intent in the instant case and that the danger of unfair prejudice substantially outweighs whatever probative value this evidence has.

As the government correctly notes, the Seventh Circuit has observed on many occasions that "[w]hen evidence is offered to prove intent, '"the degree of similarity is relevant only insofar as the acts are sufficiently alike to support an inference of criminal intent." ... The prior acts need not be duplicates of the one for which the defendant is now being tried.'" *York*, 933 F.2d at 1351 (quoting *United States v. Radseck*, 718 F.2d 233, 237 (7th Cir.1983), *cert. denied*, 465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984) (quoting *United States v. O'Brien*, 618 F.2d 1234, 1238 (7th Cir.), *cert. denied*, 449 U.S. 858, 101 S.Ct. 157, 66 L.Ed.2d 73 (1980))); *Lloyd*, 71 F.3d at 1265 (same). However, the Seventh Circuit has also cautioned that "similarity means more than sharing some common characteristics; the common characteristics must relate to the purpose for which the evidence is offered." *United States v. Torres*, 977 F.2d 321, 326 (1992). It is in this respect that the Randolph evidence is fatally deficient.

Before reaching that issue, however, we note that it is far from clear whether Gerard's conduct in the Randolph matter is probative of intent at all. In its opinion suspending Gerard from the practice of law for one year as a result of his conduct in the Randolph matter, the Illinois Supreme Court noted that "this entire incident arose from [Gerard's] ignorance of contingent fees, ignorance which he did not bother to rectify, and which caused him to draft a badly worded fee agreement and, apparently, to poorly advise his client both before and after she agreed to the fee agreement." *In re Gerard*, 132 Ill.2d at 522, 139 Ill.Dec. at 500, 548 N.E.2d at

1056. The ignorance to which the court was referring was Gerard's ignorance of the fact that a contingent fee may only be collected when a client obtains a recovery through settlement or successful litigation. *Id.* In response to Gerard's rejoinder that Randolph never asked him to renegotiate the contingent fee, the court again highlighted that Gerard's ignorance of contingent fees was to blame: "Randolph's failure to ask for a renegotiation likely resulted from [Gerard's] never explaining to Randolph the correct terms of a contingent fee ... due to [Gerard's] own ignorance." *Id.*, 132 Ill.2d at 524, 139 Ill.Dec. at 501, 548 N.E.2d at 1057. In the end, the court concluded that Gerard had collected an excessive fee, finding that "[a] lawyer of ordinary prudence would [have been] left with a definite and firm conviction that [a $159,-648.60] fee [was] in excess of a reasonable fee" ... for the nonlegal services of identifying the certificates of deposit that Randolph owned, and having them reregistered, even if it did take 160 hours over a period of two months." What is significant about the foregoing is the court's repeated characterization of Gerard's state of mind as one of ignorance. There is no suggestion of a deliberate intent to extract an excessive fee from Randolph.

Nor did the court purport to attribute to Gerard an intent to defraud or deceive in that portion of its opinion addressing the Hearing Board's finding that Gerard engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of Illinois Supreme Court Rule 1–102(a)(4). Gerard challenged this finding before the Illinois Supreme Court on the grounds that the Administrator's complaint did not state a cause of action under Rule 1–102(a)(4) because it did not allege fraud with the requisite specificity, and the Administrator did not prove that Gerard's conduct constituted fraud by clear and convincing evidence.[5] In holding that the complaint sufficiently stated a cause of action, the court remarked, in pertinent part as follows:

The complaint sufficiently stated a cause of action for conduct involving dishonesty,

5. Gerard also argued that the Hearing Board abused its discretion in denying his demand for a bill of particulars; however, this issue, and the

court's summary treatment of it, is immaterial for present purposes.

fraud, deceit, or misrepresentation in violation of Rule 1–102(a)(4) *insofar as his collection of an excessive fee can also be characterized as a violation of Rule 1–102(a)(4)* . . . .

Respondent was reasonably informed that he was charged with a violation of Rule 1–102(a)(4) *due to his collecting a $159,648.60 fee, which the Administrator alleged was excessive, to reregister Randolph's certificates of deposit.* The complaint also alleged all facts essential to establish a Rule 1–102(a)(4) violation: *respondent's services consisted of reregistering the certificates in the trust's name, and he collected a fee of $159,648.60, which was excessive.* We hold that the Administrator stated a Rule 1–102(a)(4) cause of action . . . .

In addition, we find that the Administrator proved by clear and convincing evidence that respondent's conduct constituted fraud. *Collecting an excessive fee in and of itself can constitute fraud subject to discipline under Rule 1–102(a)(4); intent to defraud or to deceive is not an element.*

Unfortunately, when the Hearing Board concludes in its report that respondent "engaged in conduct involving dishonesty, fraud, and deceit in violation of 1–102(4) [sic]" it does not specify to what conduct it is referring; from the report, however, we deduce that the Hearing Board is referring to respondent's collecting the excessive fee, not to any other false statements or deceptive conduct that were unalleged in the complaint. The Hearing Board could have concluded validly that this conduct was fraudulent under Rule 1–102(a)(4).

*Id.,* 132 Ill.2d at 526–28, 139 Ill.Dec. at 502–03, 548 N.E.2d at 1058–59 (emphasis added). It is quite clear in this passage that the Illinois Supreme Court simply bootstrapped the conduct involving dishonesty claim on to the excessive fee claim without professing to find any fraudulent intent—for, as the court observes, "intent to defraud is not an element."

The court then proceeded to conclude that Gerard's conduct also constituted constructive fraud, noting:

Constructive fraud does not require as an element that the actor have a dishonest purpose or an intent to deceive, and constructive fraud can be inferred from the parties' relationship and the circumstances. The appellate court has further defined constructive fraud as: "any act, statement or omission which amounts to positive fraud or which is construed as a fraud by the courts because of its detrimental effect upon public interests and public or private confidence. . . . [It is] a breach of legal or equitable duty which, irrespective of the moral guilt of the wrongdoer, the law declares fraudulent because of its tendency to deceive others." (In re Estate of Neprozatis (1978), 62 Ill.App.3d 563, 568, 19 Ill.Dec. 470, 378 N.E.2d 1345.)

In the present case, the attorney-client relationship between respondent and Randolph was a fiduciary relationship as a matter of law. . . . We hold that when respondent collected the excessive fee of $159,648.60 from Randolph as payment for his services in connection with the "recovery" of the certificates of deposit, and then failed to initiate a renegotiation of his fee, respondent breached his fiduciary duty and, as a consequence, committed a constructive fraud; *we so hold even though there is no evidence that respondent intended to cheat or to defraud Randolph.*

*Id.,* 132 Ill.2d at 528–29, 139 Ill.Dec. at 503, 548 N.E.2d at 1059 (emphasis added). Again, it is significant to note that here, not only does the Illinois Supreme Court decline to attribute a fraudulent intent to Gerard, but it affirmatively states that "there is no evidence that respondent intended to cheat or to defraud Randolph."

If this was all the Illinois Supreme Court had said, this Court would have little difficulty excluding the proposed evidence because the government's position that the Randolph matter is probative evidence of Gerard's intent in the Lawson matter simply could not be sustained. The absence of any finding of fraudulent intent in the Randolph matter would render the connection between Gerard's conduct in that matter and his conduct in the charged offense too attenuated to be probative of intent. In effect, the Government would be putting on evidence of Gerard's previous negligence (albeit negligence

that was deemed fraudulent and found culpable) as evidence of his fraudulent intent in the Lawson matter. This Court finds no basis, and the government cites no authority, for such an inferential leap. To the contrary, " '[w]here the issue addressed is the defendant's intent to commit the offense charged, the relevancy of the extrinsic offense derives from the defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic and charged offenses.' " *Torres*, 977 F.2d at 326 (quoting *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir.1978) (*en banc*). Thus, as *Torres* teaches, this Court must "examine each of the extrinsic criminal acts in this case to determine whether [Gerard] committed them with the same type of ... intent that he allegedly harbored when [he committed the charged offense." *Id.* Here, the proffered evidence would not withstand that examination because of the absence of any finding of fraudulent intent in the Randolph matter.

However, this cannot be the end of the inquiry. The Illinois Court was not required to make a finding of fraudulent intent. The Court's limited role on review was to determine whether the Administrator had proved fraud by clear and convincing evidence, and the Court was able to do so without specifically making a finding as to whether Gerard acted with fraudulent intent. However, at one point in its opinion, the Court observed:

> The Hearing Board, which observed respondent's demeanor when he testified, reasonably could have found clear and convincing evidence that respondent never explained to Randolph the simple procedures he used to "recover" the certificates of deposit (respondent testified only that he reported back to Randolph as he got information, not that he explained to her what he was doing and that no adverse claims had been made), and could have further found that by failing to explain this to Randolph while collecting a $159,648.60 fee respondent engaged in conduct involving fraud by omission. Thus, there is clear and convincing evidence upon which the Hearing Board could have based a finding that respondent engaged in conduct involving fraud as that term has been defined by this court.

132 Ill.2d at 528, 139 Ill.Dec. at 503, 548 N.E.2d at 1059. Thus, although at odds with its earlier statement that there was no evidence of fraud, here the Court clearly indicates that there was sufficient evidence to support a finding of fraud (indeed clear and convincing evidence of fraud) as a result of Gerard's concealment of the means by which he recovered Randolph's assets while collecting over $159,000 in fees.

Based on this Court's own evaluation of the proposed evidence, we too find that a factfinder could conclude that Gerard engaged in fraudulent conduct through the deceitful concealment of material facts in this case. Nevertheless, this conclusion does not end our analysis. Instead, we now must return to the issue of probative similarity. Given the fraudulent nature of Gerard's conduct in the Randolph matter, we must conclude that there is virtually no probative similarity between that conduct and the charged conduct. We fail to see how Gerard's deceitful concealment of the fact that he was receiving an excessive windfall as the result of an unartfully drafted contingency agreement that he was construing to his advantage in 1985 sheds much, if any, light on his mental state as he allegedly defrauded Lawson in 1993.

 It is important to bear in mind that the fact that prior conduct involved fraud and the charged conduct involves fraud cannot alone justify admission of the prior act evidence. *See United States v. Macey*, 8 F.3d 462, 466 (7th Cir.1993). The pertinent inquiry here must be whether the prior fraudulent conduct is sufficiently similar to the charged fraudulent conduct as to be relevant to proving Gerard's state of mind when he engaged in the charged conduct. Thus, prior frauds have been found to be properly admitted as evidence of intent where the prior frauds involve similar conduct, *see United States v. York*, 933 F.2d 1343 (7th Cir.1991) (finding evidence that the defendant previously took out $50,000 double indemnity policy on woman that he then murdered was relevant to proving intent in a mail fraud prosecution involving the same conduct); *United States v. Harrod*, 856 F.2d

996 (7th Cir.1988) (finding that evidence of a prior stolen check scheme was admissible to prove intent in a prosecution for "identical conduct"), or where the prior conduct involved "substantially the same pattern of dealing." *United States v. Harvey*, 959 F.2d 1371 (7th Cir.1992). In such cases, the prior act evidence actually makes a finding of intent more likely than not—thereby allowing the factfinder to transcend the impermissible propensity inference—because the similarity of conduct suggests consciously and deliberately designed action. Absent this sort of similarity, evidence of prior frauds allows only the inference that where one has committed frauds in the past he or she is likely to do so again. This is nothing but a propensity inference. As the Seventh Circuit has put it,

> Where the 404(b) evidence is offered to prove intent, the test requires that the prior bad act have some connection with the defendant's intent to commit the charged crime. Otherwise the evidence tends to prove only a propensity to commit crime—that the defendant was a bad guy in the past and presumably still is.

*Macey*, 8 F.3d at 466. This is precisely our analysis of the proposed evidence.

Although Gerard's conduct in the Randolph matter and the Lawson matter share some common characteristics, this Court cannot conclude that those characteristics relate to the purpose for which the government seeks to introduce the Randolph evidence—*viz.*, establishing intent. In the final analysis, the Randolph evidence tends to prove only a propensity to commit crime—that Gerard was willing to act unethically in the past and presumably still is—but this is precisely the type of evidence Rule 404(b) is designed to preclude.

Not only does the Randolph evidence fail the second prong of the 404(b) test, but the Court also finds that, in view of the dissimilarity discussed above, the relatively weak probative value of the evidence is substantially outweighed by the danger of unfair prejudice. We conclude that the Randolph evidence strongly invites the forbidden propensity inference—namely, that because Gerard acted unethically in the past, he did the same with Lawson. On the other side of the scale, the evidence is, at best, only minimally probative of Gerard's fraudulent intent in the Lawson case. Additionally, because Randolph was elderly, infirm, and virtually alone in the world at the time that Gerard unethically exploited her, there is a great risk of unfair prejudice stemming from the likelihood that admission of this evidence would flame the jurors' passions and excite their retributive impulses to punish Gerard for preying on such a vulnerable individual.

For all of the foregoing reasons, the Court concludes that the government's motion to admit the Randolph facts must be denied.

### (b) *Other Excerpts*

The government also seeks to admit various portions of the Illinois Supreme Court's opinion in the Randolph matter to establish Gerard's knowledge of various legal principles, which the government contends will be relevant to rebutting certain of Gerard's defenses. As noted earlier in this opinion, the Court's evaluation of the proposed evidence is hindered by the fact that it is unclear what precisely Gerard will put into issue by way of defense. Accordingly, the Court will rule on the government's motion based on the present record, with the understanding that the Court will revisit these issues on the motion of either party based on the testimony presented at trial.

■ (i) *A client's acquiescence:* In his defense before the Illinois Supreme Court, Gerard argued that Randolph never asked him to renegotiate his fee and that she authorized his redemption of the unmatured CD on January 10, 1986. In its opinion, the Illinois Supreme Court commented: "[A] client's acquiescence to an attorney's misconduct does not purge it of its unethical character. .... [T]he unethical nature of respondent's actions in collecting an excessive fee is not ameliorated by Randolph's failure to question him about it or to file a complaint with the Commission."

The government submits that as a defense to his conduct in the Lawson matter, Gerard has asserted that Lawson did not object to various expenditures, including the expense

of paying the Gerards a fee of $666,666. Consequently, the government seeks to introduce this portion of the Court's opinion to establish that Gerard knew he had certain obligations to communicate with Ethel Lawson, and that his failure to do so was designed to conceal his conversion of her funds.

This Court has already ruled that Gerard's conduct in the Randolph matter may not be admitted for establishing intent, and we will not repeat that analysis here. With respect to the use of this portion of the opinion as evidence of Gerard's knowledge of his ethical obligations to communicate with his client, the Court finds the passage to be of little probative value. In that passage, the Illinois Supreme Court was addressing Gerard's obligation to inform Randolph of the correct terms of a contingent fee and of the nonlegal administrative means by which he had "recovered" her CDs; not anything having to do with an attorney's obligation to communicate with a client when the attorney seeks to recover a contingent fee that exceeds the limits provided by statute (an issue that was not addressed in the Randolph opinion). Thus, the quoted passage really addresses quite dissimilar conduct and sheds virtually no light on the relevant knowledge. This proffer would simply allow the back-door introduction of evidence the Court has already found inadmissible. Additionally, for all the reasons discussed above, introduction of evidence relating to the Randolph matter poses a great risk of unfair prejudice that substantially outweighs its probative value. To whatever extent that the government wishes to introduce evidence bearing on Gerard's duty to communicate to his clients, that evidence is readily available through an appropriate expert. Accordingly, the government's motion to admit this portion of the Randolph opinion is denied.

■ (ii) *Excessive fees:* The government seeks to introduce that passage from the Illinois Supreme Court's opinion wherein the court states:

We conclude that [Gerard] charged Randolph an excessive fee, and thereby violated Rule 2–106(a). "[a] lawyer of ordinary prudence would [have been] left with a definite and firm conviction that [a $159,-648.60] fee [was] in excess of a reasonable fee" ... for the nonlegal services of identifying the certificates of deposit that Randolph owned, and having them reregistered, even if it did take 160 hours over a period of two months.

132 Ill.2d at 524, 139 Ill.Dec. at 501, 548 N.E.2d at 1057. Again, the Court finds this evidence to be little more than an end-run attempt to convey evidence that Gerard has previously been disciplined for unethical conduct. That will not be permitted. Moreover, because the Court finds the underlying circumstances giving rise to the Illinois Supreme Court's conclusion that Gerard charged excessive fees in the Randolph matter to be so dissimilar to the circumstances relating to Gerard's alleged conversion of Lawson's money, the Court finds the above-quoted passage to be wholly irrelevant to Gerard's state of mind. Accordingly, the government's motion to introduce this passage is denied.

■ (iii) *Ignorance is no excuse:* Anticipating a defense of ignorance, the government seeks to introduce the following passage from the Randolph opinion.

Respondent's defense in this proceeding is ignorance: Because he had never entered into a contingent fee agreement before, he was ignorant of the proper form and ignorant of the Code's provisions on collecting an excessive fee. But if [Gerard], realizing his ignorance of contingent fees despite his four years of service on the Chicago Bar Association's Professional Fees Committee, had sought to remedy it by doing the research necessary to draft a proper contingent fee agreement, presumably he would not now be before us; it would have been clear to him that he could not charge a one-third contingent fee because he did not "recover" Randolph's certificates of deposit by means of a settlement or judgment.

132 Ill.2d at 522–23, 139 Ill.Dec. at 500, 548 N.E.2d at 1056. The government argues that this passage put Gerard on notice that ignorance is no excuse and that he knew he had a duty to inquire if he lacked knowledge concerning law or facts; and, his failure to do so, is evidence of intent. We are unpersuad-

ed by this argument. As is evident from the last clause of this quote, which the government omitted from its brief, the Illinois Supreme Court was explicitly referring to the issue of what constitutes a "recovery" as that term is used in a proper contingent fee agreement. The Court finds nothing in this passage that is relevant to the issue of Gerard's intent when he engaged in the charged conduct.

■ (iv) *Fiduciary duty:* The government seeks to introduce the following excerpt as evidence that Gerard knew he had a fiduciary duty to his client and therefore acted intentionally when he took Lawson's money and made misrepresentations to her:

> [T]he attorney-client relationship between [Gerard] and Randolph was a fiduciary relationship as a matter of law.

132 Ill.2d at 529, 139 Ill.Dec. at 503, 548 N.E.2d at 1059.

The Court denies the government's motion to admit this passage at this time. The prejudicial effect of alerting the jury that Gerard has been the subject of a disciplinary matter before the Illinois Supreme Court substantially outweighs the probative value of this evidence. Fed.R.Evid. 403. In the event that Gerard testifies that he was unaware that he stood in a fiduciary relationship with Lawson, the Court will reevaluate this ruling.

■ (v) *Outside Legal Counsel:* The government seeks to introduce the following passage from the Illinois Supreme Court's opinion in which the Court notes that it was improper for Gerard to have Randolph sign a document releasing him from all claims in connection with the trust without advising her that she should first seek independent legal advice:

> The other ethically improper course of conduct was respondent's having Randolph sign a release when he returned the remaining securities to her along with an accounting. This document stated that Randolph released respondent from "any and all claims in connection with the

trust." Apparently, when Randolph signed this document she had not received independent legal advice on whether she should sign it, and respondent had not suggested that before signing she should seek such advice.

132 Ill.2d at 533, 139 Ill.Dec. at 505, 548 N.E.2d at 1061. The government contends that this passage is evidence of intent because Gerard never advised Lawson to seek independent legal advice concerning the Gerards becoming trustees for her estate, or concerning whether the Gerards were entitled to additional attorneys' fees. Because these issues were not involved or discussed in the Randolph case, the Court finds the proposed passage to be irrelevant to the issues in this case.[6] Therefore, the government's motion is denied.

■ (vi) *The disciplinary code:* Finally, the government seeks to introduce the following passage:

> Ignorance of the code is no excuse.... "Attorneys who fail to understand and follow the disciplinary rules do so at their peril".... "Every member of the bar has a paramount obligation to study the code and abide by its principles."

132 Ill.2d at 538, 139 Ill.Dec. at 508, 548 N.E.2d at 1064. Because this passage indicates that Gerard had been warned about the importance of knowing and abiding by the code, the government argues that it is evidence that Gerard acted intentionally when he deposited Lawson's money in personal accounts in violation of the disciplinary code. Again, placing client's money into personal accounts was not at issue in the Randolph matter. Accordingly, we find the probative value of this passage to be minimal and substantially outweighed by its prejudicial effect of informing the jury that Gerard has been subject to disciplinary proceedings before the Illinois Supreme Court. The motion is denied.

(2) *Ruth Armstrong Estate*

■ After careful consideration of the proposed evidence relating to Gerard's con-

6. Significantly, although Gerard was also a trustee of Randolph's estate, the Illinois Supreme Court did not discuss whether there was any unethical conduct involved in connection with that.

duct in connection with his representation of the Armstrong estate, the Court finds that this evidence does not satisfy the second prong of the 404(b) analysis and therefore cannot be introduced into evidence. The government maintains that the Armstrong estate conduct is similar to the charged conduct, stating: "In that matter, as in the Lawson matter, [Gerard] attempted to take monies from the estate, for his own benefit, which he was not authorized to take." Govt.'s Reply at 12. While there plainly are similarities when Gerard's conduct in the two matters is characterized in its most general and abstract manner, as the government does here, the Court is more impressed by the differences.

The essence of the government's charges against Gerard is that he raided and converted Ethel Lawson's settlement proceeds, over which he exercised control, by depositing those proceeds either into his Client Funds Account or into Lawson's trust for which he served as trustee without supervision. Gerard then allegedly attempted to conceal the conversion of Lawson's funds by fraudulently representing that he had used her money for legitimate expenses and fees. In contrast, Gerard's conduct in the Armstrong matter did not involve any theft or misuse of funds in his possession or control. Instead, the Armstrong matter involved conduct in which Gerard devised a fraudulent scheme to collect unauthorized fees by bypassing his client's approval of those fees by structuring a real estate closing such that he was paid $9,000 directly at the closing.[7]

The proposed evidence certainly supports the inference that Gerard engaged in fraudulent conduct by failing to disclose material information (namely, that he had already directly collected $9,000 at the closing) to the Armstrong estate when he submitted his bills for services rendered. However, as we explained above in reference to the Randolph

matter, the fact that prior conduct involved fraud and the charged conduct involves fraud cannot alone justify admission of the evidence. *See United States v. Macey,* 8 F.3d 462, 466 (7th Cir.1993). We will not repeat that discussion again here although it applies with equal force. In the instant case, the government has made very little effort to demonstrate any probative similarity between Gerard's conduct in the Armstrong matter and in the charged conduct and this Court finds the government's showing insufficient.

While cognizant of the fact that prior conduct need not be identical to the charged conduct to be sufficiently similar for Rule 404(b) purposes, there must be some type of probative overlap in the conduct and we find none here. Although Gerard's conduct in the Armstrong matter was plainly improper, it is so qualitatively different from Gerard's alleged outright raiding of accounts under his control and subsequent attempts to deceive Lawson as to how her funds were expended, that we find the former conduct to be irrelevant to Gerard's intent as to the charged conduct. In view of this marked dissimilarity in the nature of the conduct, evidence as to the Armstrong estate matter could only serve to invite the impermissible propensity inference that because Gerard allegedly abused one fiduciary relationship, he is more likely to have abused Ethel Lawson's trust by deceiving and defrauding her. The danger of this improper use of the evidence (and the associated risk that the jury will seek to convict out of a desire to punish Gerard for his prior conduct) substantially outweighs its very minimal probative value. The government's motion to admit this evidence is therefore denied.

*(3) Elaine Tsiros*

■ After careful consideration of the government's proposed evidence relating to

---

**7.** While it is clear from the government's account that the fees Gerard collected at the closing were unauthorized in the sense that his client did not approve of the fees in advance, the government is quite vague as to whether Gerard's claim to the fees was made in good faith or was otherwise legitimate. The government simply informs the Court that after the client reviewed the closing documents and discovered the $9,000 direct pay-

ment, "[he] told Gerard to repay the $9,000. Gerard repaid $4,000." Govt.'s Mot. at 16. It is impossible to tell from this account whether the $4,000 repayment reflected fraudulent billings (*e.g.,* personal expenses being charged to the client, charging for fees not owed by the client, etc.) as were involved in the Lawson matter or simply the compromise of a good faith dispute as to the amount to which Gerard was entitled.

Gerard's alleged misuse of Elaine Tsiros' earnest money, the Court concludes that this incident is also too dissimilar to the charged conduct to be relevant to Gerard's intent in the Lawson matter. Indeed, the Court cannot accept the government's strained contention that Gerard's allegedly improper conduct with respect to his handling of Tsiros' earnest money constitutes a prior fraud in the relevant sense. The Court concurs with the government that a jury could conclude from the proposed evidence that Gerard converted and commingled Tsiros' funds. However, not every conversion or improper use of a client's funds constitutes fraud. And, while Gerard may have had an intent to knowingly misuse Tsiros' funds, this does not necessarily equate to an intent to mislead or deceive. Apparently, recognizing this shortcoming in the proposed Tsiros' evidence, the government argues that Gerard's conduct was fraudulent insofar as (1) he concealed from Tsiros the fact that he had misappropriated her money from December to April, and (2) by depositing money from his personal account into the Client Funds Account and then issuing a check from the Client Funds account to return Tsiros' earnest money when the transaction fell through, Gerard concealed the fact that Tsiros' money had not been held in escrow.

The Court cannot accept these novel theories. As to the first argument, the Court notes that there is no indication that Tsiros or anyone else ever asked Gerard about the status or condition of her escrow account or that Gerard responded to such inquiries in a deceptive manner. Absent such evidence, the government's argument that Gerard "concealed" the misappropriation of Tsiros' money amounts to little more than a claim that theft is fraudulent unless the thief provides notice of the theft to his or her victim. There is no legal basis for this proposition. The government's second argument must also fail. The Court cannot accept the government's premise that the act of issuing a check on his Client Funds Account amounted to a deceptive representation that Tsiros' funds had been safely held in escrow. This Court concludes that the government's proposed evidence relating to the Tsiros funds could support only an inference of conversion and commingling, not fraudulent intent. Accordingly, we find the proposed Tsiros evidence too dissimilar to be relevant to the issues of Gerard's intent or absence of mistake with respect to the charged conduct. The proposed Tsiros evidence could only serve to invite the inference that because Gerard converted Tsiros' funds he is more likely to have committed the charged offense. This is nothing more than a propensity inference. Again, the danger of this improper use of the evidence (and the associated risk that the jury will seek to convict out of a desire to punish Gerard for his prior conduct) substantially outweighs its very minimal probative value. The government's motion to admit this evidence is therefore denied.

## CONCLUSION

Because the government's proposed evidence does not meet the standards of Fed. R.Evid. 404(b) and 403, the government's motion seeking a pretrial determination that such evidence is admissible must be denied in its entirety. Fundamental fairness dictates that Gerard only be required to defend the allegedly illegal conduct charged in the pending indictment and that he not be convicted of the charges solely because he was "tarred and feathered" as a disreputable attorney by the government's bad conduct evidence.

The Court expressly notes, as indicated in the body of this opinion, that the government may revisit these rulings after the Court has evaluated all of the trial evidence. Additionally, nothing within this opinion will prevent the government from inquiring about the excluded evidence during defendant's cross-examination, if and when he elects to testify. At that point, the dictates of Fed.R.Evid. 608(b) and 403 will control.