129 F.3d 119
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
William J. GERARD, Sr., Defendant-Appellant.
 No. 96-4123.
 United States Court of Appeals, Seventh Circuit.
 Argued September 12, 1997.
Decided October 10, 1997.
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division, No. 96 CR 98; Ruben Castillo, Judge.
 Before CUMMINGS, EASTERBROOK, and KANNE, Circuit Judges.
 
 ORDER
 
 1
 William J. Gerard, Sr. and his son William J. Gerard, Jr., both Chicago lawyers, were indicted in six counts based on their scheme to defraud their client, Ethel Lawson. Counts 1, 3, and 5 charged them with mail fraud in violation of 18 U.S.C. § 1341. The remaining counts charged them with interstate transportation of funds obtained by fraud in violation of 18 U.S.C. § 2314.
 
 
 2
 In April 1996 Junior pled guilty to Count 2 of the indictment pursuant to a plea agreement.
 
 
 3
 In late May and early June 1996, a jury trial was held on the charges against Senior and he was found guilty on all counts. On December 4, 1996, he was sentenced to sixty months on each count to run concurrently. He was also ordered to pay $40,854 to Ethel Lawson and $100,000 to Junior for further payment to victim Mary Ann Flynn. Three years of supervised release were imposed on Senior to follow his incarceration.
 
 FACTS
 
 4
 From January 1993 to January 1995, Senior and Junior were engaged in a scheme to defraud their client Ethel Lawson. They won a $2,000,000 settlement for her in a medical malpractice case. Upon receiving the money they took for themselves twice as much as they were supposed to and later stole more money from the settlement funds. They also took various steps to conceal their theft.
 
 
 5
 Ethel Lawson had suffered a stroke in 1990 leaving her with speaking, reading, writing, and memory problems. She became a client of the Gerard firm in 1991 and it filed a medical malpractice case for her resulting in a February 1993 settlement for $2,000,000. Chicago attorney William H. Hooks was retained by the Gerards to work on the Lawson case. He told Junior that under Illinois law attorney's fees in medical malpractice cases were limited to one-third of the first $150,000, 25% of the next $850,000, and 20% of any amount over $1,000,000 and not to ask Mrs. Lawson for a one-third fee. Nevertheless, the Gerards told Mrs. Lawson that their fee would be one-third.
 
 
 6
 In February 1993 the Circuit Court of Cook County, Illinois found Mrs. Lawson competent to settle her case. Senior told Hooks that the Gerards had arranged for the Northern Trust Bank in Chicago to handle the settlement money and that Mrs. Lawson understood this. Senior suggested to her that he and Junior be trustees.
 
 
 7
 All the Gerards were entitled to was a $462,500 fee under Illinois law but they had previously agreed to take $900,000 for themselves. In February 1993 they put the $2,000,000 settlement into several accounts. One million dollars was placed into a trust fund for Mrs. Lawson at Strong Funds in Wisconsin. While the Gerards each deposited $400,000 into personal accounts at Strong Funds, they also deposited $50,000 each into their personal accounts at the Suburban Bank of Barrington, Illinois. The remaining $100,000 was held in their Clients' Funds Account. Senior wrote the checks distributing the money.
 
 
 8
 Despite their promise, no money was put into an account for Mrs. Lawson at the Northern Trust Company. Senior hired another son, Kevin, who worked at Strong Funds, to act as Mrs. Lawson's investment advisor and Senior agreed to pay Kevin 1% of her $1,000,000 trust in addition to the 1.5% fee charged by Strong Funds. Normally, fees for a trust would have ranged from 1% to 1.5% so that the 2.5% was high. Northern Trust's fee for such a trust would have covered Kevin's fee. Under Illinois law, an attorney was prohibited from investing client funds outside the client's state without the client's authorization and it violated the trust relationship for a family member to profit from a client trust.
 
 
 9
 After the settlement, Mrs. Lawson requested a checkbook to have access to her money but none was received. The account opened for her at Strong Funds did not give her check-writing privileges. Senior instructed a secretary-receptionist at the Gerard firm not to let Mrs. Lawson's bills leave the law firm on the ground that the Gerards were trustees of the estate and would handle the bills. Senior also told her not to let Hooks or his secretary see the bills. However, once Hooks was out of the picture, Senior was less concerned about the confidentiality of the bills.
 
 
 10
 Mr. Lawson prepared a letter for his ex-wife asking for an accounting of her money and on April 1, 1993, the Gerards met with Mrs. Lawson and two of her lady friends to discuss the $2,000,000 settlement. The Gerards gave Mrs. Lawson a memorandum to explain what they had done with the money, although there was no discussion of their fees. The memorandum listed the Gerards' fees as $666,000. They did not tell their client that she could object to the one-third rate represented by the $666,000 nor did they say they would request further fees in court.
 
 
 11
 The memorandum the Gerards gave Mrs. Lawson stated that the Gerards incurred $35,000 in paralegal fees which Mrs. Lawson had to pay. However, Mary Ann Flynn, the paralegal, had worked as a volunteer and did not receive any payment for her work. The Gerards' memorandum also showed a bill for investigation for $5,000 whereas the investigator had done only $415 worth of work. The memorandum also requested additional payments to attorneys Hooks and Arnold Bernstein for $35,570, although Hooks had previously explained he was going to be paid entirely by the Gerards and would not cost the Lawsons anything. Mrs. Lawson never heard of Bernstein before.
 
 
 12
 The Gerards also stated they had incurred $21,000 in trustees' fees but did not explain those charges. They said they were also holding an additional $169,796.65 but did not say why. They claimed they were holding $200,000 in attorney's fees and were holding $169,000 to cover any claims by former husband Donald Lawson. However, the total funds in the Gerards' corporate and client funds account and Junior's Strong Funds account totaled $320,000. The Gerards also listed billings for an investment advisor, although they never explained who he was.
 
 
 13
 The Gerards billed Mrs. Lawson $21,500 for expenses in connection with a lease and telephones for Mrs. Lawson at the Park Shore Chicago apartment complex where Senior had helped Mrs. Lawson rent an apartment. The negotiations had lasted only one and one-half hours, and the Gerards had used Mrs. Lawson's money to buy telephones for themselves.
 
 
 14
 During the April 1 meeting, Mrs. Lawson gave the Gerards a letter from Donald Lawson requesting money from the Gerards, including $18,000 they had promised him for his help in her medical malpractice case, plus $60,000 to $70,000 that was his "end of the suit." Junior stated that Donald had nothing coming to him, but Mrs. Lawson told the Gerards that if they owed Donald anything they should give it to him. At the close of the meeting the three women told the Gerards that they did not understand the Gerards' explanations of the various expenses.
 
 
 15
 On April 26, 1993, Donald filed a complaint with the Attorney Registration and Disciplinary Commission (ARDC) regarding the Gerards and then told Junior about it. In response, the Gerards decided to file a motion for fees in excess of the statutory maximum.
 
 
 16
 Senior appeared before Judge Maddux on April 27, 1993 and stated that his firm had spent about $100,000 in pursuing Mrs. Lawson's medical malpractice case. The Gerards' motion also stated that their firm had dedicated all its time and effort, including the time of one partner and one paralegal, on the case. Judge Maddux granted the motion of April 28, 1993, without knowing about Donald's ARDC complaint about the Gerards. Neither Mr. Hooks nor the defense lawyers who settled Mrs. Lawson's malpractice case received notice of the Gerards' April 27 fee motion.
 
 
 17
 After receiving Donald's letter at the April 1st meeting with Mrs. Lawson, the Gerards realized they needed to explain how they allocated the settlement money. Therefore, Junior characterized the $400,000 in his Strong Funds account as a client trust fund so that the ARDC would not hold the Gerards accountable. Junior told Donald that he would give Donald some money in response to Donald's having contacted the ARDC although Mrs. Lawson had not agreed to give Donald any of the settlement money.
 
 
 18
 In May 1993, the Lawsons explained their concerns to Mr. Hooks and showed him a copy of the Gerards' April I memorandum listing their fees as $666,000. Consequently, Hooks asked the Gerards about their April 1 accounting. He asked Junior why Hooks' fee was charged to Mrs. Lawson. Junior stated that Mrs. Lawson had agreed to pay Hooks' expenses and that she had also agreed to pay $35,000 for paralegal Mary Ann Flynn. Junior stated that he had to hire a number of people to pursue Mrs. Lawson's case, including his sister Tara whom Mrs. Lawson allegedly had agreed to pay. Junior said that $10,766 charged for storage was for case boxes put in the firm's junk room. He stated they had billed Mrs. Lawson for Kevin Gerard's acting as an investment advisor. He said the $21,550 on the April 1st memorandum was for helping Mrs. Lawson with her apartment lease, car, and telephone. Junior said they were retaining $169,796 to defend Donald's claims against Mrs. Lawson. When Hooks tried to speak with Senior, he was told the matter was none of Hooks' business.
 
 
 19
 In May 1993, the Gerards gave Mrs. Lawson a check for $129,000 along with a memorandum that the firm was returning $169,000 being held, less the firm's expenses. However, the Gerards were merely repaying Mrs. Lawson with her own money!
 
 
 20
 After the Lawsons saw Mr. Hooks, he filed a motion to vacate the April 27 order of Judge Maddux granting the Gerards' motion for fees in excess of the statutory maximum. Hooks also notified the ARDC and told the Lawsons to contact Jenner & Block to handle the case. Soon thereafter a hearing was held by Judge Maddux attended by Hooks, attorneys from Jenner & Block for Mrs. Lawson, and attorney John Duncan for the Gerards. As a result Judge Maddux ordered an accounting of the Gerards' work for Mrs. Lawson and gave the Gerards leave to file documentation for their billings.
 
 
 21
 For several days in June 1993, Senior, Junior, paralegal Mary Ann Flynn, and on occasion, Tara Gerard (daughter of Senior) met behind closed doors concerning the Lawson complaint. Senior gave a secretary copies of bills on the Lawson case with corrections on them for her to retype. The bills contained various alterations but the same totals. Senior and others tore up the old documents including the original bills. Senior had his secretary put some of his property in his wife's name in order to protect it, and he gave Junior a listing of dates and hours to add to his diaries in order to increase the trustees' fees and to cover the Gerards' conversion of Mrs. Lawson's money.
 
 
 22
 In June 1993, the Gerards provided Hooks with documentation for the accounting ordered by Judge Maddux. Under infrared light and infrared luminescence, Roy Mantle, a forensic document examiner, discovered that nineteen alterations had been made in the Lawson entries. The documents showed that Mrs. Lawson was originally billed for $73,550 in trustees' fees with that sum being taken out of her trust fund or the Client Fund account and that $7,550 was later repaid, so that $68,000 remained in trustees' fees. However, according to a witness the fees should have been $5,000 to $10,000 instead of $68,000. One hundred dollars of the $73,550 had gone to Senior's massage therapist instead of to supplies as shown on the accounting.
 
 
 23
 In August 1993, Jenner & Block put pressure on the Gerards. Senior elected back surgery to slow their action, but on September 1 Junior agreed to pay $450,000 plus interest back to Mrs. Lawson.
 
 
 24
 Mary Ann Flynn hired the Gerards to handle her divorce and her mother's medical malpractice case. In turn, she volunteered paralegal time to the Gerards on the Lawson case. Twenty to thirty times she loaned the Gerards money without collateral. She did receive a promissory note for $10,000 at 12% interest with monthly payments of $500 signed by both Gerards on October 15, 1991, but she did not receive the payments. On May 18, 1992, she received another note signed by the Gerards promising her $84,516.74 and 50% of the Lawson fee. On June 7, 1992, she received a promissory note secured by both Gerards for $510,000 with 7% annual interest.
 
 
 25
 In April 1992, Mary Ann Flynn received a $300,000 settlement in her mother's case with fees of $87,500 to the Gerards. She deposited $200,000 into a Strong Funds account in Wisconsin on April 21, 1992. Thereafter, she lent $200,000 from this account and a Citibank account in Chicago to the Gerards. On March 9, 1993, Senior wrote her a check for $50,000 as a payment on some of the money the Gerards had borrowed.
 
 
 26
 In a meeting with the Gerards in June 1993, Junior told Mary Ann Flynn she should say that the March 9 $50,000 check was for work for them, although she had never been actually employed by the firm. As a result, she lied about the money during her June 1993 deposition and subsequently falsely told the Internal Revenue Service (IRS), the ARDC, and a federal law enforcement officer that the money was salary.
 
 
 27
 In May 1995, IRS Agent Hattie Fitzgerald interviewed Senior about his 1993 tax returns. Senior told her that he and Junior would split fees in Junior's cases 50-50. He said he transferred property into his wife's name in 1993 to avoid litigation. On his tax form he indicated $452,000 was from the Lawson settlement. He deducted $50,000 as payments to Mary Ann Flynn. He also claimed deductions for payments to Hooks and Bernstein, although the money had come out of a client fund. He also told her his firm owed in excess of $300,000 in loans to Mary Ann Flynn.
 
 
 28
 The Government proposed to introduce other prior bad fact evidence in its prosecution of Senior. That evidence is summarized in the district court's lengthy opinion holding it inadmissible (926 F.Supp. 1351 (N.D.Ill.1996)) and it will not be discussed herein.
 
 Government's closing argument
 
 29
 Senior claims that several of the government's closing arguments denied his right to a fair trial and his Fifth Amendment privilege against self-incrimination. We do not agree.
 
 
 30
 Senior claims that the government commented on his failure to testify. The statement assailed is as follows:
 
 
 31
 I want you to think about the kind of individual that would do this. I want you to think about the kind of person that would do this to his son and walk away from it. I want you to look at him. Look at him now. Look at his eyes. Look inside him.
 
 
 32
 The court sustained the defendant's objection and later instructed the jury that the defendant had an absolute right not to testify and that the jury should not consider his failure to do so in arriving at a verdict.
 
 
 33
 In the first place, the statement did not comment on the defendant's failure to take the stand. In any event he was fully protected by the court's sustaining his objection and giving a curative instruction. Since the government did not comment on Senior's failure to testify, there was no error.
 
 
 34
 Alleged misstatements of evidence and misleading the jury
 
 
 35
 Although Senior contends that the government misstated the evidence, misled the jury and drew improper inferences from the evidence during closing argument, we do not agree. First of all, the court instructed the jury that opening statements, closing arguments and other statements of counsel should be disregarded unless supported by the evidence.
 
 
 36
 Government counsel told the jury that Mrs. Lawson thought the fees were one-third because both Gerards told her so. This statement was fully supported by Mrs. Lawson's testimony and by the actions of both Gerards and the testimony of Barbara Garrette, a friend of Mrs. Lawson.
 
 
 37
 The Gerards hired detective Jim Everett to work on the Lawson case and other matters. Everett prepared a bill for $2,500 for his work on the Lawson case even though his work was worth only $415. The government did not misspeak when it stated that the Gerards asked Jim Everett to give them a bill because Everett testified that Junior asked him for an invoice and stated that he had been hired to do the work and that he had been paid by a check signed by Senior.
 
 
 38
 At the trial government counsel said that Judge Maddux, who handled the question of the Gerard firm's fees, had stated that the firm dedicated all its time to the Lawson matter but the statement clarified that the firm was spending the full time of one partner and one paralegal and that Senior only spent one day a week on the matter. Since the fee motion presented to Judge Maddux indicated that the firm was dedicating "all its time and effort," including the full time of one partner and paralegal, there was no mischaracterization of the evidence by government counsel. Other evidence before the jury made it plain that only Junior and a paralegal spent full time on the matter and the government made it plain that Senior did not spend all of his time on the Lawson matter. Therefore we reiterate that there was no mischaracterization of this evidence.
 
 
 39
 Senior also challenges the government's statement in closing argument that he had made alterations in his diary as a cover-up. However, there was no objection to the statement during the trial and the evidence did show alterations in his time records. Therefore there was no prejudicial error.
 
 
 40
 Senior also objects to the government's reference to the fact that the defendant did not call either Lawson to testify. There was no objection to this reference. Moreover, the defendant was of course free to call Donald Lawson if it wished to query him about his drug use. Also, the defense could have called both Lawsons if it wished to show their strained relationship. During closing argument the defense argued that Junior took responsibility for forging checks his wife had written and that Junior tried to pin everything on Senior in order to protect Junior's wife. In rebuttal the government counsel stated that Senior's counsel could have called Junior's wife. Defense counsel finally told the court that he would not call Junior's wife if he "could get everything [he] needed out of Junior," and subsequently he never called Junior's wife. Since the defense did not think it needed to have Junior's wife testify, there was no error in the government's mentioning that if the defense wished, she could have been called as a witness.
 
 
 41
 The government used a deposition excerpt showing that Gerard and Hooks had entered into an agreement for a $300 hourly fee to Hooks because Senior could not find the original. This did not mean that Senior had destroyed the original. Furthermore there was no such objection. While the government described certain defense arguments as "smoke and clouds," that does not constitute an attack on the character of defense counsel because it was not impugning defense counsel's honesty and integrity.
 
 
 42
 Testimony of forensic document examiner was admissible
 
 
 43
 Senior had waived his request for any hearing about the methodology of the government's expert document examiner, Roy Mantle. Prior to trial the government gave defense counsel a statement of the scientific basis for Mantle's testimony. Senior subsequently never moved to disqualify Mantle's testimony. Consequently it was unnecessary to have a pretrial hearing to evaluate Mantle's methodology pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 508 U.S. 579. In any event, the defense had full opportunity to cross-examine Mantle during trial.
 
 Donald Lawson's heroin addiction
 
 44
 Defense counsel asserts that the district court should have allowed him to bring up Donald Lawson's drug abuse. However, in a pretrial ruling the district judge had determined that such evidence was both tangential and unfairly prejudicial within the balancing of Federal Rule of Evidence 403. After Mrs. Lawson testified about Donald's treatment of her, the district judge invited defendant to discuss Donald's abuse at a sidebar, but the defense never accepted the invitation. Finally, there was no necessity to produce that evidence since it had already been established that Donald had mistreated Mrs. Lawson during the marriage.
 
 District court's calculation of loss
 
 45
 Senior complains that the district court should not have attributed a loss of $816,000 to him. This computation was as follows: $437,500 stolen when the Gerards took $900,000 of the settlement for themselves plus $40,950 the Gerards took from Ethel for additional trustees' fees plus $35,570 paid from Ethel's money for attorneys Hooks and Bernstein and $20,693 in additional reimbursements from her money. The court subtracted $23,613 in legitimate expenses charged to Ethel to settle the case. The court added to the $511,100 a tax loss from Senior's improper deduction of expenses he did not incur, making the loss so far at $549,110. The court then added a $267,000 loss Senior caused client Ethel Boeninger in another case where Senior retained $267,000 of a client's money. Since the judge sentenced Senior to 60 months, within the range excluding the Boeninger figure, any error was harmless.
 
 
 46
 Use of statutory fee in calculating Mrs. Lawson's loss
 
 
 47
 Because Mrs. Lawson agreed to a one-third fee of $666,660, Senior contends that the district court should not have used the statutory fee of $462,500 in calculating her loss. Therefore Senior claims the starting point for the loss calculation should be $233,000 rather than $437,500. We disagree. The district court indicated that because Junior had signed Mrs. Lawson to the $462,500 statutory fee, that fee should be used as the basis for the loss calculations. The theft occurred when the Gerards put $900,000 into their accounts on February 23, 1993. They did not file a motion for the one-third fee until April 27, 1993, and previously had no right to an increase in the $462,500 fee approved by Mrs. Lawson. There was also no error because Junior testified that he and Senior had converted everything above the statutory fee.
 
 
 48
 Differences between calculations of Senior's and Junior's loss accounts
 
 
 49
 Senior contends that there is an incorrect disparity between him and Junior because the government agreed with Junior in his plea agreement that the loss he inflicted was between $350,000 and $500,000. Senior claims that this difference entitles him to a reduction in his loss account pursuant to § 2F1.1 of the Sentencing Guidelines. However, disparities in sentences between defendants is not a reason for reversal. United States v. Monem, 104 F.3d 905, 911 n. 3 (7th Cir.1997). In addition, the court reasoned that Junior should be in a lower bracket because he was not responsible for inflicting additional losses through improper "trustee's fees." In any event, an assessment made after the government learned all the facts, rather than its preliminary assessment in a plea agreement, is proper.
 
 
 50
 Alleged underestimate of value of trustees' fees
 
 
 51
 Senior contends that he should have received credit for $48,950 trustee's fees instead of $8,000. However, the court properly determined that the $48,950 was fraudulent because it included time billed to prepare the April 1 st memorandum covering the Gerards' misconduct. Nevertheless the court decided it was appropriate to give him $8,000 credit for his actions as a trustee. It would have been inappropriate for the district court to give credit to Senior for supervising Mrs. Lawson's accounts when he used that supervision to take money from his client.
 
 Exclusion of fees paid to other attorneys
 
 52
 Judge Castillo refused to credit Senior for $35,570 paid to Hooks and Bernstein for their work reasoning that Hooks told the Lawsons they would not have to pay for his participation and Hooks also testified that he told Junior that there should be no charge for Bernstein. Bernstein himself explained that he thought his fees were to be paid out of the Gerards' share of the settlement, not Mrs. Lawson's. Mary Ann Flynn also stated that Hooks and Bernstein had not been paid out of Mrs. Lawson's settlement. In these circumstances the district court properly refused to rely on Junior's testimony. Finally, the Gerards could not properly take the $35,570 from Mrs. Lawson because they had not received permission from the court for that expense.
 
 
 53
 Raising Senior's offense level for Mrs. Lawson being a vulnerable victim
 
 
 54
 Senior argues that Mrs. Lawson was not a vulnerable victim so that the district court should not have raised his offense level two points under Sentencing Guideline § 3A1.1(b). However, Judge Castillo was justified in considering Mrs. Lawson to be a vulnerable victim. The court relied on a neuropsychological evaluation showing that Mrs. Lawson suffered mental disabilities because of her stroke. In fact Mrs. Lawson herself testified that she cannot speak fluently and mixes up words. She also had difficulty in testifying. Consequently the district court was justified in considering her a vulnerable victim. Having represented Mrs. Lawson in her medical malpractice case, Senior knew of her limitations and took advantage of them, thus justifying the raising of his offense level by two points.
 
 
 55
 The district court was justified in increasing Senior's offense level for obstruction of justice
 
 
 56
 Defendant argues that he should not have received a two-level increase under § 3C1.1 of the Sentencing guidelines for obstructing justice. However, the evidence showed that Senior instructed paralegal Mary Ann Flynn to lie, had relevant documents destroyed and altered his own time diaries. Thus the enhancement was proper. The evidence showed that at the direction of the Gerards, Mary Ann Flynn had often lied about her earnings from their firm. Eventually she recanted her lies. Since she had been directed to lie at the direction of the Gerards, § 3C1.1 was also appropriate for this reason. Finally, the alteration of relevant documents obviously was intended to hinder the investigation of the offense, again justifying enhancement under § 3C1.1*
 
 
 57
 Judgment and sentence affirmed.
 
 
 
 *
 Other arguments presented by defendant have been considered but do not merit discussion